[Civ. No. 20390. Second Dist., Div. Three. Apr. 8, 1955.]

DONALD DUANE JONES et al., Minors, etc., Appellants, v. JOHNSTON TESTERS, INC. (a Corporation), Respondent.

Joseph Passin for Appellants.

Gibson, Dunn & Crutcher, Ira C. Powers and Sherman Welpton, Jr., for Respondent.

VALLÉE, J.—Plaintiffs appeal from a judgment of nonsuit granted in a jury trial of an action for wrongful death.

The rules which govern a reviewing court in the determination of an appeal from a judgment of nonsuit are well known and need not be repeated.

Plaintiffs are the heirs of Clayton Jones, who died as a result of injuries received on May 23, 1952, while working as a rotary helper upon an oil well which was being drilled by his employer, K. L. Kellogg and Sons. On the day of the accident drilling had progressed to the stage where a water shutoff test was to be made. The tools for the test were furnished on a rental basis by defendant, Johnston Testers, Inc.,[1] at the request of K. L. Kellogg and Sons. The test was supervised by defendant's employee, Earl Hittson, but the work was done by Kellogg's crew. At the time of the accident the shutoff test had been completed. There is no claim that the men in that Kellogg crew were general or special employees of defendant.

The Kellogg crew consisted of five men: three were known as rotary helpers, and Jones was one of them; another, Senske, was the drilling foreman; and the fifth man, Narron, was derrick man. All of them worked at or about the level of the derrick floor except Narron who was on a small platform known as a "monkey board" at the side of the derrick and about 85 feet above the floor. The testing equipment, when delivered to the job by Hittson, was assembled by the Kellogg crew under his directions. That equipment included a chain, a hook, and two "wet" plugs which came into use only after the test was made and while pipe was being pulled from the well. This was standard equipment in the oil fields.

The operation was this, so far as pertinent to the case at bar: the tester having been hoisted out of the hole, pipe was pulled, being handled in stands of three sections of about 30 feet each, or 90 feet a stand. When the top of the stand reached a convenient height a wet plug would be screwed by hand into the top, thus closing it; the object being to prevent any fluid—gas, oil, water—from spurting out the top of the pipe. The plug was put in place by one of the rotary helpers; it was then attached to the hook which was on the end of the chain, and the chain fastened to the hoisting or elevator equipment. This being done the stand of pipe would be raised until the top was some 4 or 5 feet above the derrick man, Narron, and about 3 feet in front of him. The lower

---

[1] The record does not disclose what happened with respect to other defendants, but the only respondent is Johnston Testers, Inc.

end of the stand of pipe was then unscrewed by a rotary table, a ''wet box'' attached to the bottom, and the fluid drained out through it. After that was done the pipe would be lowered somewhat, the derrick man would unscrew the wet plug from the top of the stand, and the plug would then hang free at the end of the hook and chain; the pipe would then be lowered into a rack; and the handling of the next stand would begin.

John L. Lucas, one of the rotary helpers, said he screwed in the particular plug; others say Jones did that; all agree that Jones put the ring of the plug into the hook, and, according to Lucas, ''I watched him rattle it back and forth as we always did to see that it was latched.'' The two stood there, awaiting their next movement while the pipe was being drained and lowered; the wet plug fell and hit Jones on the head inflicting the fatal injuries.

The plug is made of aluminum, about $4\frac{1}{2}$ inches in its greatest diameter and weighs some $7\frac{1}{2}$ pounds. In its top is a metal ring with an inside diameter of $2\frac{1}{2}$ inches. When in use the plug is attached to a ''safety hook'' which is on the end of a chain about 6 or 7 feet in length. The chain is fastened at the top of the hoisting apparatus, part of which is known as the elevator. The elevator raises and lowers the pipe. The hook is the part of the equipment which was responsible for the accident. It is generally oval in shape, some 6 inches long and 3 inches wide, and made of bronze. On the front is a moveable ''safety latch'' which when closed forms a continuous piece of metal with the rest of the hook and will not permit the ring of the plug to escape from the hook; when opened there is a space of about 2 inches in the front of the hook through which the ring of the plug can be inserted or removed. To open this latch (when the hook is operating properly) it is necessary to apply an inward pressure to the latch from the outside and at the same time press a spring trigger in the back of the hook. It is a squeezing movement. When this is done the latch opens and stays open until the trigger is pressed again; when that occurs the latch automatically closes. In a normal operation the plug, when unscrewed by the derrick man from the pipe, hangs on the closed hook which is on the chain.

On the day of the accident a stand of pipe was pulled to the height where the plug was to be installed. Lucas or Jones, the decedent, installed the plug. Jones then placed the hook in the ring on top of the plug. It was his duty

to close the hook. The pipe was then raised and at the appropriate time Narron, the derrick man, seized and held the chain, which was slack, in his left hand while he unscrewed the plug with his right hand, and let it swing by the chain behind the elevator. He then racked the pipe. Normally the plug would hang free at the lower end of the chain and in the hook. While Narron was racking the pipe, the plug fell and hit Jones on the head. The hook and chain continued to hang from the top of the elevator apparatus, and the hook was found to be open when it was lowered and examined after the accident.

The defendant in this action is a third person who supplied equipment to Jones' employer. The duty resting upon the hirer is summarized in this language, at page 673 of Prosser on Torts:

"It is now generally agreed that a seller, or other supplier of chattels for a consideration, may be liable for harm to the person or property of a third person who may be expected to be in the vicinity of the chattel's probable use, if he has failed to exercise reasonable care to make the chattel safe for the use for which it is supplied."

The Restatement says:

"One who leases a chattel as safe for immediate use is subject to liability to those whom he should expect to use the chattel, or to be in the vicinity of its probable use, for bodily harm caused by its use in a manner for which, and by a person for whose use, it is leased, if the lessor fails to exercise reasonable care to make it safe for such use or to disclose its actual condition to those who may be expected to use it." (Rest., Torts, 1095, § 408.)

Comment a. upon said section says:

"*When lessor must inspect.* The fact that a chattel is leased for immediate use makes it unreasonable for the lessor to expect that the lessee will do more than give it the most cursory of inspections. The lessor must, therefore, realize that the safe use of the chattel can be secured only by precautions taken by him before turning it over to the lessee."

And comment b.:

"The rule stated in this Section is peculiarly applicable to persons who make a business of leasing chattels. In such a case, in the absence of an understanding to the contrary it may be assumed that both lessor and lessee understand that the article is leased as fit for immediate use."

(See also *Larramendy* v. *Myres*, 126 Cal.App.2d 636, 640 [272 P.2d 824]; *Mondine* v. *Sarlin*, 11 Cal.2d 593, 597 [81 P.2d 903]; *McCall* v. *Pacific Mail S. S. Co.*, 123 Cal. 42 [55 P. 706]; *Jaehne* v. *Pacific Tel. & Tel. Co.*, 105 Cal.App.2d 683, 688 [234 P.2d 165].)

■ Jones was seen to connect the hook and plug in the usual manner, and the absence of his testimony due to his death creates a presumption of the exercise of reasonable care on his part. (*Scott* v. *Burke*, 39 Cal.2d 388, 394 [247 P.2d 313].) Thus the particular movement of the elevator starts with the ring of the plug properly inserted in the hook and the hook properly closed. The fact that they stayed in place on the upward trip is also some evidence to this effect.

Narron, the derrick man who unscrewed the plug some 85 feet in the air, testified that in unscrewing the plug ''You hold the chain up with your left hand and unscrew the plug and set the plug back in the elevators, unlatch your door, take the pipe out of the elevators and rack it behind. . . . The Court: So, when you say you set it back, you put it behind the elevator and let it hang free? The Witness: Put it behind the elevators. Q. By Mr. Passin [attorney for plaintiffs]: In relation to the monkey board, how far below the monkey board is the plug at the time that it is hanging suspended by the chain? A. It is not below the monkey board. It is above the monkey board about 5 feet. Q. It is above the monkey board at that time? A. At that time, yes. The Court: When you unscrew this plug, is it about your shoulder height? The Witness: Just about shoulder height. . . . Q. While you are racking the pipe, after you open the door of the elevator, where is the plug at that time? A. It is behind the elevators. Q. Hanging from this chain; is that right? A. Yes. Q. And except for the chain and the hook, is there anything else that holds the plug up? A. Just the chain and hook. Q. In this operation, can you explain more in detail how you would take the plug out? How would you remove the plug? A. You have to unscrew it. Q. And you unscrew it with which hand? A. Your right hand. Q. Would you only use the one hand? A. Well, it depends on which link you would have the chain on. If you have it—— Q. I am talking about this—— A. This particular time? Q. Yes. A. It was on the left link, and that would make the chain slant down to the plug. Naturally, you use your left hand to hold the chain and unscrew it with your right. Q. So, on this day, when you were performing these duties,

you held the chain in your left hand? A. That's right. Q. And unscrewed the plug with your right hand? A. Unscrewed it with your right hand. . . . Q. Did you have to handle the hook at all in this operation? A. No. Q. You didn't have to touch it at all; is that right? A. No. Q. Just preceding the accident, what did you do in relation to the plug and the chain? A. Well, I took it out of the pipe when I pulled it up there. Q. On this occasion; I am talking about the time just before the accident; how did you do it? A. I pulled the chain up with my left hand, unscrewed the plug and set it back in the elevators. . . . Q. Then it hung free; is that right? Then the plug hung suspended by the chain? A. Yes. Q. Did you touch the hook at all? A. Not that I ever remember of. Q. Would there be any occasion for you to touch the hook? A. No, there would be no reason for me to touch the hook. Q. Just before the accident, on this last time when the stand of pipe was up to your level, did you look at the safety hook which is attached to the plug? A. Well, I looked at the plug and chain, hook and all. You have to, to get ahold of it. If I couldn't see, I couldn't get ahold of the chain. Q. Did you observe whether or not the hook was in an open or closed position? A. Well, I couldn't say if it was or if it wasn't at that particular time. . . . Q. Did you have any occasion to examine the safety hook at all at any time after the accident? A. No. Q. Do you remember whether or not this particular safety hook and plug was used at all again after the accident? A. It was not. Q. At the time that you unscrewed the plug, just preceding the accident, what position were you in? A. Well, you are leaning out against you bellybuster and safety belt about four and a half feet out from the edge of your monkey board. Q. You are standing up, though, are you not? A. Well, no; you are on your feet, but you put your feet on the edge of your monkey board and you lean over to get to the pipe. Q. And you are supported, you say, by this bellybuster? A. And safety belt. Q. How far away at that time is the pipe with the plug from the monkey board? A. It is approximately four and a half feet. Q. I believe you stated that the plug at that time was about shoulder level; is that right? A. That is right. Q. You say your left hand was on the chain. How far from the plug was your left hand on this occasion? A. I would think around ten inches; eight inches or ten inches, you know, above, just enough to get above the swivel and the chain. Q. At that time is there a slack in the chain or is the chain tight? A. Yes,

there is slack in the chain. Q. Do you recall whether or not the swivel on the chain was operating on that occasion? A. I think it was, yes.

"Q. BY MR. PASSIN: Mr. Narron, when you set the plug behind the elevators on these occasions that morning when you were pulling the pipe out, do you remember if at any time the plug swung on the chain? A. Well, yes, the elevators swing. You pull the pipe over before you unlatch them, and the elevator or plug, links and all, swing back. Q. I am talking merely about the plug that is suspended from the chain. Does that swing? A. Yes, they all swing. . . . Q. [BY MR. WELPTON, attorney for defendant]: And this whole thing is moving, kind of swinging and swaying up there, isn't it? A. Yes. Q. ——When you are trying to take this plug out and take this pipe and rack the pipe, after you get the plug out; isn't that right? A. Well, when you take the plug out, it is not swinging; but when you get it out and set it behind your elevators, then pull your pipe over to unlatch the elevators, then when the elevators comes off the whole thing swings, blocks and all. Q. So now you just took this plug on out and then you just pushed it out through the elevators, or out beyond the elevators there? A. Set it behind. Q. And just let it down, didn't you? A. Yes. . . . Q. BY MR. PASSIN: There is one thing I am confused about, Mr. Narron, and that is the swinging of the elevator. You mentioned that the elevator swings, is that right, at some point in this operation? A. When you pull your pipe to you, you have a rope on the derrick that you put around the pipe, and you pull it over and unlatch your elevators. Well, when the door comes open, the elevators swing back. Q. You pull over the pipe; that operation you just described. Is that done before or after the plug is unscrewed? A. That is after the plug is unscrewed. Q. And you say the elevators go back; is that right? A. Yes. Q. They swing back? A. When you unscrew the plug and set it back of the elevators, then you take ahold of your haul-back rope and pull it to you and unlatch it. Q. How far back would the elevators swing, do you know? A. They would swing two feet, I guess. Q. And when they swung two feet, what would happen to the plug and chain that was suspended from the links? A. Well, it would swing with them, I guess. Q. They would swing with the elevators. On this occasion immediately preceding this accident, did the elevators swing? A. Yes. . . . THE COURT: Not how far will it swing; how far back did it swing? Q. BY

Mr. Passin: On this occasion, this time. A. Well, I never measured it. I couldn't say exactly. Q. What is your best—— A. Approximately 18 inches to two feet. Q. When the elevator swung back, did you see on this occasion what happened to the plug? A. No. When I unlatch the elevators and take the pipe, then I rack it behind and tie it back; my attention is all on that pipe when I unlatch the hook, or the elevator door, and it opens; then I am all through with the elevators and I have to take care of my pipe."

Mr. Royce D. Leer, a mechanical and industrial engineer, who was employed as safety engineer for Kellogg's insurance carrier, testified that he was given possession of the chain, hook, and plug within three days after the accident. He took the hook with him and in his own office examined it as "completely as we could without taking it apart." He testified that the points of contact between the safety latch and the trigger, where it was intended to hold the hook in a closed position, were quite badly worn, even for bronze; instead of meeting squarely, they were worn around 7, maybe 10, degrees on each side; by "degrees on each side" he meant "an inclined plane of about seven or ten degrees on each of the two members"; the wear was at the point of contact between the latch and the trigger; the points of contact were worn down to an angle between 7 and 10 degrees on each side; the excluded angle would be about 14 or 15 degrees. Exhibit 1, produced by defendant, is a plug, hook and chain similar to the one involved in the accident, but not the same one. The hook involved in the accident was not produced. Using Exhibit 1 for illustration the witness pointed out a worn spot "where the trigger falls back, and pulling the latch way forward, the worn space that denotes the wear on both can be readily observed." He also said there is not as much wear on Exhibit 1 as there was on the hook which was in the accident.

Mr. Leer further testified:

"Q. [By Mr. Passin]: What effect, if any, would this wearing have on the particular hook that you examined?

"A. First, it would remove the squareness of the angle and offset the latching capabilities of the safety latch; and, secondly, the angle of the inclined plane would allow for a decrease in the amount of pressure necessary to snap it open without using the trigger.

"Q. I show you Plaintiffs' Exhibit 1 and ask you whether or not you can demonstrate that on this hook that we have introduced here in evidence. . . .

"THE WITNESS: There is already some play in here, and by increasing the angle, it offsets the force of the spring. Instead of hitting square, if it is hitting like this, it will allow that to ride up and push it out of the rod.

"MR. WELPTON: For the record, may that be described? He is showing an exertion of pressure on the outside of the latch.

"THE WITNESS: On the outside of the latch only.

"THE COURT: I understand from your testimony, in your opinion, the wearing of the part indicated would permit pressure on the outside without touching the latch to——

"THE WITNESS: Yes, sir; because an inclined plane—well, it is a wedge; a wedge, depending upon its angle, will always increase the amount of work to be done by a given effort. As your Honor can see, the latch does not entirely encompass the end of the trigger now. The wearing actually has to be over only about one-half of the end of the latch to allow for a pressure opening on the latch."

 Mr. Leer was then asked this question by counsel for plaintiff: "Was the wearing on the hook that you examined to such an extent as to create the hazard of it being opened without exerting pressure on both the latch and the trigger at the same time?" Defendant objected to the question on the grounds it was "incompetent, immaterial, not within the issues of the case, and no proper and sufficient foundation laid." The objection was sustained. The ruling was error and highly prejudicial. The crucial question in the case was whether the hook was worn to the extent that it would open without pressure being exerted on both the latch and the trigger at the same time. That Mr. Leer was a highly qualified expert is not subject to debate. His qualifications had not been questioned. The effect of the wear he saw and described was strictly a matter for expert testimony.

 "It has long been recognized that expert testimony is not only proper but also virtually indispensable in cases where the relation between the facts and results may be understood only by those with special skill or training." (*Natural Soda Products Co.* v. *City of Los Angeles,* 109 Cal.App.2d 440, 443 [240 P.2d 993].) That is the situation here. (See also *Manney* v. *Housing Authority,* 79 Cal.App.2d 453, 460 [180 P.2d 69]; *Jutras* v. *Satters, Inc.,* 96 N.H. 300 [75 A.2d 712, 713]; 20 Am.Jur. 647, § 775; 32 C.J.S. 394, § 569.)

The witness had disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury. The purpose of the

question was apparent. It is evident from the question itself and from the previous testimony of the witness that his answer would have been favorable to plaintiffs. No offer of proof was necessary. ■ Where a question to which an objection is sustained indicates that the answer to it will be favorable to the party seeking to introduce the testimony and the question is a material one, it is not necessary to make an offer of proof. (*Cripe* v. *Cripe,* 170 Cal. 91, 94 [148 P. 520] ; *Chambers* v. *Silver,* 103 Cal.App.2d 633, 642 [230 P.2d 146].)

In erroneously excluding the testimony of Mr. Leer as indicated, the court effectively denied plaintiffs a fair opportunity to prove their case. The ruling was an abuse of discretion compelling a reversal.

Reversed.

Wood (Parker), Acting P. J., concurred.

Ashburn, J. pro tem.,* dissented.

A petition for a rehearing was denied May 5, 1955. Ashburn, J. pro tem.,* was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied June 2, 1955.

*Assigned by Chairman of Judicial Council.