FORD, J.
 

 This is an appeal by the plaintiff from a judgment of nonsuit in an action to recover damages for personal injuries suffered by him while using a machine to compact earth.
 

 The first cause of action of the third amended complaint was founded on allegations of negligence on the part of the
 
 *250
 
 defendants. The second and third causes of action were based on theories of warranty. As to the warranty causes of action, the trial court granted a nonsuit on the grounds that there was no evidence of an express warranty on the part of the defendant Fornaeiari Company and that there was no evidence that the plaintiff gave notice to either of the defendants of the breach of any implied warranty pleaded. (See
 
 Vogel
 
 v.
 
 Thrifty Drug Co.,
 
 43 Cal.2d 184, 187-188 [272 P.2d 1].) The plaintiff does not appear to challenge the correctness of the ruling as to the second and third causes of action. Consequently, this opinion is concerned only with the cause of action in which negligence on the part of the defendants was alleged.
 

 The defendant Barco Manufacturing Company manufactured an earth compactor known as a “Barco Rammer.’’ It sold the machine involved in the present case to the defendant Fornaeiari Company, a partnership. The latter leased the machine to the plaintiff’s employer, McDonald Brothers. In the course of his use of the machine the plaintiff suffered burns. As set forth in the pretrial conference order, some of the issues were whether there was negligence on the part of the manufacturer in the design of the machine and on the part of the defendant Fornaeiari Company in the maintenance thereof and whether the machine was an inherently dangerous instrumentality when used for the purpose for which it was designed. One of the contentions of the plaintiff was stated to be that there was negligence on the part of each defendant which consisted of a failure to test and inspect the machine. The matter of proximate causation was also at issue.
 

 In their brief the defendants acknowledge that the manner in which the Barco Rammer operated to compact earth is accurately described in the plaintiff’s opening brief. That description is as follows: “The Barco Rammer is an earth-tamping device, which operates, generally, much like a child’s pogo
 
 stick;
 
 its primary purpose is to tamp the earth to harden the ground. It is gasoline powered and is operated by one man standing on the ground and holding the Rammer in an upright position so that the piston tamps the surface of the earth. The machine has a small gas tank attached to it, and gasoline is introduced into an internal combustion chamber by gravity where it is ignited by a spark plug. The resultant explosion within the chamber causes the pistons to move up and down and thereby compact the earth on the
 
 *251
 
 down stroke. After contacting the ground, the machine leaps into the air approximately fourteen inches and comes down again some 50-60 times per minute.” The operator, standing on the ground, holds onto the machine by placing his hands on a semicircular handle bar which extends toward him from the machine.
 

 There will be stated herein evidence which gave support to the plaintiff’s case. The accident occurred on March 28, 1957. The plaintiff testified that he went to work for McDonald Brothers two or three months before the accident and that he started to use the Barco Rammer a week or two later. He always used the same machine. His face would be about 18 inches from the top of the cap on the gasoline tank while the machine was stationary. Bach time the machine would go up and down, he would be sprayed with gasoline and oil which would come both from the small hole in the center of the cap and from the vicinity of the part where the threads for the cap were. The fluid would get on his hands and face and the front part of his body. He would work without wearing clothing above his waist. He carried a cloth for use in drying his body. When the cap would get loose, “a little bit more” fluid would escape. He further testified as follows: “Q. You say, sir, that during the entire two or three months that you used this machine you always had to tighten the cap about every 15 or 20 minutes? A. Not all the time. Q. When were the times that you did not have to tighten it? A. When I was working on soft dirt. Q. It would then be a longer period of time, perhaps 30 minutes? A. I am not sure.” The plaintiff said that other than tying a piece of cloth on the handle of the cap, he did nothing to stop or prevent the gasoline from getting on his person. The cooling vents on the machine became hot when it was used.
 

 On cross-examination, the plaintiff testified in part as follows : “Mr. Yaras, you told us on direct examination that at some time during the operation of the machine you saw some gasoline coming out of a hole in the cap ? A. Of course, because when one uses it, it moves and it sprays out from there. ... Q. Did you see any gasoline or mixture of gasoline and oil come out of any hole in that gasoline cap at any time while you were operating it? A. Yes, and you could note it because you could note that immediately in your hands. Q. Would it be correct to say that you did not see it spray out but only noticed moisture on your hands ? A. Well, it is impossible to see the oil when it comes toward you. Q. In other
 
 *252
 
 words, you never saw it come from the machine but only saw it on yourself? Is that correct? . . . The Witness: Well, I do not know.”
 

 The accident happened in the afternoon. The plaintiff testified that, after lunch, when he was using the machine, “gas” came out of the little hole in the cap. About 20 minutes before the accident, the cap became loose; he tightened it and continued to operate the machine. He further testified as follows: ‘‘Q. After lunch were you involved in a fire ? A. Yes. Q. What part of your body was on fire? A. Well, I could not exactly see how my body was but from what I felt afterwards, I felt it in my body above my waist. Q. Did you see any flames? A. Yes. Q. Where did you see the flames ? A. In my hands. Q. Did you see flames on any other party of your body ? A. It is impossible to tell you exactly where something like that is or where something isn’t at a time like that. ... Q. Do you recall, if at all, if your hands were on the machine when you saw your hands burning? A. Yes. Q. On what part of the machine were your hands? A. A place where it’s curved, where one has to get hold of the machine to operate it. . . . Q. Well, did you hear any noise just before you saw your hands on fire? . . . The Witness: Yes. Q. By Mr. Mepham [counsel for plaintiff] : What kind of noise did you hear? A. Something like that—phoof—that’s all. . . . Q. When you saw your hands on fire, did you notice if any part of the machine was burning?. A. No.” In the course of the cross-examination, the plaintiff stated as follows: “Q. By Mr. Ruston [counsel for defendants] : Now, Mr. Varas, you did not see the fire start, did you, sir? A. No. Q. You did not see what happened to cause the fire at the time it started, then? A. The only thing I heard was the noise. Q. Would you say that noise sounded like an explosion? A. I cannot—I do not know that. ’ ’
 

 R. A. Gibbs, an employee of the defendant Fornaciari Company, was called as a witness by the plaintiff pursuant to the provisions of section 2055 of the Code of Civil Procedure. He worked as a mechanic in the maintenance of Barco Rammers. He testified that when the particular machine was returned after the accident, “it had a slightly burned ignition wire on it,” the burned portion being “from the spark plug up to the guard wire, the guard loop.” The entire wire leading up to the magneto was replaced. With respect to the cap used on the gasoline tank of a Barco Rammer, the witness testified that a neoprene “0” ring is placed on the cap “to keep the
 
 *253
 
 threads from leaking gasoline” and “to hold the cap tight.” The “0” ring is. replaced when necessary because of its condition. A screw has not been used to close the hole in the top of the cap since 1954; before that time a screw was inserted through the handle of the cap, the purpose being to prevent gasoline from running out when the machine was laid on the ground. It did not actually screw into the small hole in the cap, but a little rubber part on the end was placed against the hole. Part of Mr. Gibbs’ testimony was as follows: “A. . . . The reason it was taken off was because so many of the people won’t unscrew them so the machine would run out of gas rapidly and stop. Q. Actually, if you screwed that thing down tight completely the gravity feed wouldn’t even work, will it? A. No. Q. . . . Don’t you have to loosen it up for the gas to drop down this line? A. That’s right.” The cap is part of a fitting which has threads so that it can be screwed into the tank. The thread used is tapered whereas a machine thread is straight. He further said: “ Q. So that actually if the threads went down entirely this tube, then, it would be narrower at the bottom than at the top; the threads would be wider at the top than at the bottom ? A. The way that thread is made, yes. Q. So, if you tried to measure the bottom part of the thread, it’s not as wide as the top part? A. Not quite, no, sir. Q. Likewise in this part of the collar it is wider at the top and it narrows down at the bottom? A. Yes, slightly.”
 

 W. P. Fornaciari, a partner in the defendant Fornaciari Company, testified that the machine involved in the accident was manufactured sometime between the years 1952 and 1954. As to the operation of the machine, he testified in part as follows: “Q. In normal operation about how high does this machine jump ? A. 14 inches. 15 inches is the maximum. Q. Do you have any idea as to the foot pounds or pressure it exerts when it hits the ground ? A. The machine raised weighs 210 pounds. If it drops 14 inches, it is dropping one and a sixth feet, times 210 pounds. I think that is just about 230, 240 foot pounds. . . . Q. About how many jumps a minute does this machine take, do you know ? A. The operator controls that. Fifty is the general maximum. It can be run as fast as sixty blows per minute.”
 

 The plaintiff called as an expert witness William Charles Gregory, a registered chemical engineer. He had done work as a teacher until 1955, having undertaken that kind of endeavor some 30 years before. Most of his teaching was of ' chemistry “on the college level,” but he had also taught
 
 *254
 
 physics, mathematics, and geology. His last teaching was at Compton College. He testified that he had “a machine for changing alternating current into direct current and direct current into alternating current, higher frequencies ’ ’; he had patents on that device. He held the degrees of bachelor of science and master of science from Washington State University, the latter degree being in chemical engineering. In the years 1942 to 1947, inclusive, he was the chief chemist at an aircraft plant. He had studied and worked with machines which were subject to vibration and was familiar with the effect of such vibration on particular parts of the machinery, including the parts thereof threaded with a tapered thread or with a thread not tapered. He had done “quite a little work” with gasoline motors.
 

 Mr. Gregory saw the machine involved in the plaintiff’s accident. He inspected it casually on the premises of the Fornaciari Company. He did not see it in actual operation and had never seen a Barco Rammer in action.
 

 Part of Mr. Gregory’s testimony was as follows: “Q. Now, assuming that the cap is screwed into that gasoline tank and that the cap is similar to the cap which you have examined, Defendants’ H, and assume that the tank contains a liquid mixture of gasoline and an oil substance, and further assuming that this particular machine in operation leaps approximately 40 to 50 times per minute, and assuming that the liquid mixture in the gasoline tank is at varying levels, would you have an opinion, assuming all those facts as true, as to whether or not gasoline in a liquid or vapor form would be permitted to escape from the vent hole or any part of this gasoline tank? The Court: Yes or no. The Witness: Yes, sir. Q. By Mr. Mepham: And what is your opinion? . . . The Witness: Whether it will go out or not, it just can’t help it. The Court : The answer to that is that it will go out? The Witness: Yes, sir, go out. . . . Q. By Mr. Mepham : Now, insofar as that particular cap is concerned, that contains what type of a thread on it? A. Looking at it, I would say that that is on a taper. It is a taper thread. Now, this diameter here is less than the diameter up here (indicating). The Court: And by ‘here’ and ‘up here,’ you mean less at the bottom than at the top? The Witness : Yes, it is a cone. . . . Q. By Mr. Mepham : Now, are there other types of ways of cutting threads? A. Yes, sir. . . . The Witness: The other types of threads is where the threads are parallel all the way through, like the National coarse or National fine threads. Q. Do those particular kinds
 
 *255
 
 of threads have any special name? A. No, other than the standard thread. It is a 60-degree pitch on the thread. Q. And those are called the natural coarse and natural fine? A. Yes. Q. On those types of threads is there any taper as we have in this particular cap ? A. No, sir. . . . Q. Mr. Gregory, assuming that this particular Barco rammer machine operates on an internal combustion principle, and assuming that this machine when fired causes the machine to leap or jump into the air some 14 inches, and that the machine weighs 210 pounds, and it comes back to the earth with a foot pound pressure of 280 pounds, and assuming that the amount of leaps per minute averaged some 40 to 50 leaps per minute, would you have an opinion as to whether or not that particular operation would cause vibration of the machine ? . . . The Court : It was 230, approximately. That is my understanding. Q. By Mr. Mepham : Assuming that the foot pound pressure was 230 pounds and assuming all the other facts I have stated, would you have an opinion as to whether or not those factors would cause this machine to vibrate while it was operating? . . . The Court: Well, it is my opinion that it doesn’t call for an expert opinion upon the subject. I think it would be a matter of common knowledge that a machine which weighs 210 pounds in operation jumped up and down 14 to 15 inches and came down with a pressure of 230 foot pounds is bound to have some vibration. I think it is a matter of common knowledge. . . . Q... . Now, Mr. Gregory, assuming all of the facts that I have stated already for you to assume, also further assuming that the cap was tightened on that machine [the machine involved in the accident, which was in the courtroom] to the degree of tightness that it now has, would you have an opinion as to whether or not the cap would have a tendency to become loosened while the machine was in operation ? . . . A. This cap will unloosen with the vibration. It has oil there and with a little vibration the oil gets into the threads and the threads are at an angle or a taper and they are going to loosen right away.”
 

 Thereafter, Mr. Gregory was asked the following question by counsel for the plaintiff: ‘‘Q. Now, assuming, Mr. Gregory, that this particular machine goes through the operation that I have already asked you to assume, that is, the 40 to 50 leaps per minute, 14 inches in the air, comes back to the ground at 230 pounds foot pressure, assuming that the cap of this nature is tightened as it is tightened right now on the
 
 *256
 
 machine, and assuming that the cap is screwed into an area close to gasoline and oil mixture and assuming that this machine in its operation causes a certain amount of vibration, causes vibration, would you have an opinion, assuming all of those facts, as to whether or not there would be a difference in the rate of loosening of the cap with the tapered thread as it now has as compared to the rate of loosening if there were threads that you have mentioned?” The objection of the defendants was stated in part as follows by their counsel: “I object on the grounds that it is immaterial and irrelevant and premature; no foundation to show that it has anything to do with the custom and trade and usage in this area.” In the course of the ensuing discussion of the merits of the objection, the court stated in part: “I think what you have to do is show that this machine for the purpose for which it was designed and sold, designed, manufactured and sold, fails to meet the common standards of safety in the area for a machine of this character, for the performance of this kind of work. . . . Now, he has answered with relation to tightening the cap as Yaras said he tightened it, . . . He still says it will come out but that of itself didn’t mean that it doesn’t meet, shall we say, the ordinary safety standards for this kind of machine in this area to do this kind of work. . . . That is my ruling on this line of questions. Now, any proper questions that you can develop, if you can qualify this man to the effect that he is familiar with an earth-ramming machine, that he has seen it operate, that he has examined the parts of it, and whether or not this machine conforms to that general standard, I think that is what you are required to show, I believe.” The question was not answered. Thereafter the following proceedings occurred: “Q. By Me. Mepham [counsel for the plaintiff] : Mr. Gregory, you have already testified with reference to your opinion that gas would come out of this particular cap in the operation of this machine ? A. Yes, sir. Q. Now, do you have an opinion as to a way that could be devised and that is used commonly in connection with machines that have moving liquids in them, and do you have an opinion as to how that could be remedied? A. Yes, sir. . . . Q. . . . What is your opinion? Me. Huston [counsel for defendants] : Object to that, your Honor, on the ground previously stated as to the custom and usage and trade, and so forth, without repeating in detail the objection. The Court : The objection is sustained. Q. By Me. Mepham : Mr. Gregory, with reference to machines containing liquids with caps that are attached to the containers
 
 *257
 
 in which the liquids are carried, do you have an opinion as to whether or not the loosening of the cap can be remedied by any locking devices? A. Yes, sir. . . . Q. By Mr. Mepham: What is your opinion? Mr. Buston: I will object to the question as to what his opinion is on the grounds previously stated. . . . The Court : The objection is sustained upon the same grounds. ’ ’
 

 After counsel for the plaintiff terminated his questioning of Mr. Gregory, counsel for the defendant made a motion to strike “the testimony of Mr. Gregory with reference to the gasoline cap or the gasoline escaping and the threads and loosening.” In granting the motion, the court said in part: “I admitted that testimony, ladies and gentlemen of the jury, upon the grounds that it would be connected up to the degree of safety standards usual and customary in this community applicable to this kind of machine or one similar. It has not been so done, so I am going to grant the motion to strike the testimony of this witness in relation to matters that he has testified to; one is to the escaping of the gasoline from the cap and likewise to whatever the objections were as indicated by his testimony to the threads in the cap. ’ ’
 

 During a discussion between court and counsel in the course of Mr. Gregory’s testimony, counsel for the plaintiff made an offer of proof as follows: “We intend to show . . . that there are various types of threads which can be used in caps of this sort and that one type of thread in particular, this type which is a tapered thread as opposed to other types of threads, is less effective insofar as resisting a loosening effect from vibration. ’ ’ He further stated: “We want to show that this is an inferior type of thread that is used on this machine and with vibration with which this machine is designed to perform, the tamping operation, that it would come loose easier than another simple type of thread.”
 

 While the rulings of the trial court as to the admissibility of evidence, as heretofore noted, present the problem with which the briefs of the parties are principally concerned, it is first necessary to consider the legal duty of each defendant with respect to the machine. The manufacturer of a chattel owes a duty of care toward a user, although there is no privity of contract between them, where the article is inherently dangerous or where it is reasonably certain, if negligently designed or manufactured, to place life and limb in peril.
 
 (Darling
 
 v.
 
 Caterpillar Tractor Co.,
 
 171 Cal.App.2d 713, 720 [341 P.2d 23]; see 2 Harper & James, The Law of
 
 *258
 
 Torts, §§ 28.3-28.11, 28.14.) In an annotation on the duty of a manufacturer with respect to the design of a product, it is stated: “. . . the standard which the courts have established is the traditional one of reasonable care. ... . The effect of this standard is to impose upon the manufacturer the duty to so design his product as to make it not accident-proof, but safe for the use for which it was intended.” (76 A.L.R.2d 91, 94; see
 
 Reynolds
 
 v.
 
 Natural Gas Equipment, Inc.,
 
 184 Cal.App.2d 724, 736-737 [7 Cal.Rptr. 879];
 
 Brooks
 
 v.
 
 Allis-Chalmers Mfg. Co.,
 
 163 Cal.App.2d 410, 414 [329 P.2d 575].)
 

 There is also a duty on the part of a lessor of such an instrumentality toward an employee of a lessee, for whose use the machine is obtained. He must not only warn of defects actually known but must also use reasonable care in making an examination of the machine before letting it, in order to determine that it is fit for the use known to be intended. A failure to comply with such standard of reasonable care constitutes negligence.
 
 (Tierstein
 
 v.
 
 Licht,
 
 174 Cal.App.2d 835, 841 [345 P.2d 341];
 
 Minicozzi
 
 v.
 
 Atlantic Refining Co.,
 
 143 Conn. 226 [120 A.2d 924, 926];
 
 La Rocca
 
 v.
 
 Farrington,
 
 301 N.Y. 247 [93 N.E.2d 829]; see
 
 Jones
 
 v.
 
 Johnston Testers, Inc.,
 
 132 Cal.App.2d 162, 165 [281 P.2d 602];
 
 Rae
 
 v.
 
 California Equipment Co.,
 
 12 Cal.2d 563, 569 [86 P.2d 352]; Prosser on Torts (2d ed.) 497-513; 2 Witkin, Summary of California Law (7th ed.) 1472-1473.)
 

 It appears from the record as hereinabove set forth that both the trial court and counsel for the defendants assumed that the standard of due care governing this case 4s necessarily identical with the standard of care “usual and customary” in the community with respect to the kind of machine involved in the accident or a similar machine. But customary practice is not, in and of itself, ordinary care; it is only evidence of ordinary care. (See
 
 Sheward
 
 v.
 
 Virtue,
 
 20 Cal.2d 410, 413-415 [126 P.2d 345];
 
 Miller
 
 v.
 
 Midway Fishing Tool Co.,
 
 106 Cal.App.2d 612, 614, 615 [235 P.2d 630];
 
 Owen
 
 v.
 
 Rheem Mfg. Co.,
 
 83 Cal.App.2d 42, 45 [187 P.2d 785];
 
 Northwest Airlines
 
 v.
 
 Glenn L. Martin Co.,
 
 224 F.2d 120, 129;
 
 Prosser on Torts
 
 (2d ed.) 136 ;
 
 [1]
 
 2 Witkin, Summary of California Law (7th ed.) 1406.)
 

 
 *259
 
 Moreover, for the purpose of showing that there has been a failure to comply with the standard of due care, it is proper to introduce evidence as to the necessity and feasibility of changes in the design of parts of a machine so as to enhance the factor of safety.
 
 (Reynolds
 
 v.
 
 Natural Gas Equipment, Inc., supra,
 
 184 Cal.App.2d 724, 739; see
 
 Delmore
 
 v.
 
 Polinsky,
 
 132 Conn. 28 [42 A.2d 349, 351];
 
 Hartmon
 
 v.
 
 National Heater Co.,
 
 240 Minn. 264 [60 N.W.2d 804, 811-812];
 
 Ludwig
 
 v.
 
 Zidell,
 
 167 Ore. 488 [118 P.2d 1073, 1079]; 2 Harper & James, The Law of Torts, § 28.13, p. 1563;
 
 cf. Daniels
 
 v.
 
 County of Allegheny,
 
 145 F. Supp. 358, 363;
 
 Davis
 
 v.
 
 New Jersey Zinc Co.,
 
 116 N.J.L. 103 [182 A. 850, 851].) In the
 
 Hartmon
 
 ease, the Supreme Court of Minnesota stated (60 N.W.2d, at p. 811): “Cross-examination of Dahlberg subsequently revealed that his experience with gas conversion burners was very limited and that he had little, if any, knowledge of the customs and practices of gas burner manufacturers with respect to the safety features that he had suggested.
 

 “The nature and feasibility of safeguards and precautions that could have been taken with respect to a potentially dangerous condition are proper subjects for expert testimony provided that they are not of such common knowledge that the jury is equally capable of judging them.”
 

 In
 
 Reynolds
 
 v.
 
 Natural Gas Equipment, Inc., supra,
 
 184 Cal.App.2d 724, at page 739, it was said: “While the admission or rejection of expert testimony lies largely within the discretion of the trial court, and its action will not be disturbed on appeal unless there is a showing of abuse of this discretion
 
 (Davenport
 
 v.
 
 National Reserve Ins. Co.,
 
 91 Cal.App. 460 [267 P. 132]), the test is whether the case is one
 
 *260
 
 outside the common experience of men so that a person with superior knowledge because of training and experience is better able to reach a conclusion from the facts.
 
 (Manney
 
 v.
 
 Housing Authority,
 
 79 Cal.App.2d 453 [180 P.2d 69];
 
 Wells Truckways, Ltd.
 
 v.
 
 Cebrian,
 
 122 Cal.App.2d 666 [265 P.2d 557].) It has been held that evidence is admissible to show the necessity and feasibility of adding a safety device to machinery and, also, whether machinery is properly equipped or adjusted.
 
 (Young
 
 v.
 
 Bates Valve Bag Corpp.,
 
 52 Cal.App.2d 86
 
 [125
 
 P.2d 840]
 
 ; Mulholland
 
 v.
 
 Western Gas Constr. Co.,
 
 21 Cal.App. 44 [131 P. 110,113];
 
 Pitt
 
 v.
 
 Southern Pacific Co.,
 
 121 Cal.App. 228 [9 P.2d 273].) ”
 

 As has been noted, the trial court based its determination with respect to the question of the admissibility of the testimony of Mr. Gregory relating to the escape of gasoline and the nature of the threads in the cap upon the failure of the plaintiff to show that the witness had knowledge of “safety standards usual and customary in this community applicable to this kind of machine or one similar. ” While the admission or rejection of expert testimony lies within the realm of the discretion of the trial court, an abuse of that discretion occurs when evidence otherwise admissible is rejected only because the witness does not possess knowledge of a matter which is not in fact a prerequisite to the attainment of competency as an expert with respect to the particular subject matter. In view of the applicable law discussed hereinabove, it is clear that the trial court proceeded under a misconception of the law. A problem of a kindred nature was presented in
 
 Bill
 
 v.
 
 New England Cities Ice Co.,
 
 90 N.H. 453 [10 A.2d 662]. Therein the plaintiff called two expert witnesses who testified, in general terms, that the body of the defendant’s truck was mounted upon the chassis in such a way as to make the vehicle top-heavy and cause it to tip quickly. On appeal the defendant argued that “such construction may well be reasonable and proper” and “standard construction for the particular business for which it was designed.” It further contended that the plaintiff’s evidence did not disclose “any facts upon which the jury could base and establish a standard of reasonable construction.” In rejecting such argument, the Supreme Court of New Hampshire stated (10 A.2d, at pp. 663-664): “Expert witnesses are called to give their opinions on subjects about which they have special knowledge and experience, upon the assumption that, by reason of these qualifications, they will be able to
 
 *261
 
 assist the jury in its search for the truth. When a duly qualified expert undertakes to give his opinion as to the proper or improper construction of an instrumentality, the basis for his conclusion is assumed to lie in his special knowledge of such matters, and there is no rule of law which requires that before he shall be permitted to express such an opinion ‘there must be in evidence a standard’ by which the judgment of the expert must be governed. Experts are subject to cross-examination as to the extent of their knowledge and the basis of their conclusions. The weight of their testimony will depend upon the character and extent of their special knowledge and experience.”
 

 There is, of course, prejudicial error in the improper rejection of expert testimony if thereby the party offering such evidence has been denied a fair opportunity to prove his ease.
 
 (Reynolds
 
 v.
 
 Natural Gas Equipment, Inc., supra,
 
 184 Cal.App.2d 724, 740;
 
 Jones
 
 v.
 
 Johnston Testers, Inc., supra,
 
 132 Cal.App.2d 162,171;
 
 Agnew
 
 v.
 
 City of Los Angeles,
 
 97 Cal.App.2d 557, 568 [218 P.2d 66].) Consequently, the ultimate question to be determined upon this appeal is whether the evidence received, together with that improperly rejected, constituted a sufficient case on behalf of the plaintiff for presentation to the jury. If it did, judgment of nonsuit with respect thereto was improper. “A nonsuit may be granted only where, disregarding conflicting evidence on behalf of the defendants and giving to plaintiff’s evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.”
 
 (Reynolds
 
 v.
 
 Willson,
 
 51 Cal.2d 94 [331 P.2d 48], at p. 99.)
 

 The evidence must be considered in the light of the applicable law. “All persons are required to use ordinary care to prevent others being injured as the result of their acts; ordinary care has been defined as that degree of care which people of ordinarily prudent behavior could be reasonably expected to exercise under the circumstances of a given ease. In other words, the care required must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated [citations].”
 
 (Warner
 
 v.
 
 Santa Catalina Island Co.,
 
 44 Cal.2d 310 [282 P.2d 12], at page 317; see also
 
 Johnson
 
 v.
 
 Nicholson,
 
 159
 
 *262
 
 Cal.App.2d 395, 406 [324 P.2d 307].) The.highly inflammable and volatile qualities of gasoline are matters of common knowledge. (See
 
 Feeney
 
 v.
 
 Standard Oil Co.,
 
 58 Cal.App. 587, 591 [209 P. 85].) When the evidence is viewed in accordance with the law applicable to the determination of a motion for a nonsuit, it is clear that a trier of fact would be justified in drawing the inference that the machine herein involved was defectively designed for its intended use in that its operation usually or frequently resulted in the spraying of gasoline upon the operator. Moreover, an inference would also be warranted that the persons who leased the machine to another in such condition, knowing of its intended use, were negligent because the existence of such a defect was discoverable by means of a reasonable examination of the machine prior to its delivery to the plaintiff’s employer.
 

 With respect to the issue of proximate causation, it is true that there was no direct evidence as to the cause of the ignition of the gasoline or the vapors therefrom. But proximate cause may be established by circumstantial evidence. (See
 
 Agovino
 
 v.
 
 Kunze,
 
 181 Cal.App.2d 591, 594 [5 Cal.Rptr. 534];
 
 Williamson
 
 v.
 
 Pacific Greyhound Lines,
 
 78 Cal.App.2d 482, 486 [177 P.2d 977];
 
 County of Alameda
 
 v.
 
 Tieslau,
 
 44 Cal.App. 332, 337-338 [186 P. 398].) Where reliance is placed on circumstantial evidence, it is not necessary that there be no possibility of deriving any other reasonable inference from the evidence.
 
 (Johnson
 
 v.
 
 Nicholson, supra,
 
 159 Cal.App.2d 395, 405;
 
 Sanders
 
 v.
 
 MacFarlane’s Candies,
 
 119 Cal.App.2d 497, 500 [259 P.2d 1010].) From the conditions and circumstances shown by the record in the present case the inference could reasonably be drawn that a spark emanating from the machine was the cause of the ignition; such a result was one reasonably to be anticipated. (Cf.
 
 Teasdale
 
 v.
 
 Beacon Oil Co., Inc.,
 
 266 Mass. 25 [164 N.E. 612, 613].)
 

 While the evidence was of a nature sufficient to support a determination by a jury in favor of the defendants on the issue of contributory negligence or on the issue of assumption of risk, such a determination as to either of such issues would not be required as a matter of law. The governing law was clearly expressed by Mr. Justice Vallée in
 
 Johnson
 
 v.
 
 Nicholson, supra,
 
 159 Cal.App.2d 395. Therein, at page 410, it was stated with respect to contributory negligence that: “Knowledge that danger-exists is not knowledge of the amount of danger necessary to charge a person with negligence.
 
 Doing an act with appreciation of the■ amount of
 
 
 *263
 

 danger, as well as of danger itself, is necessary to render a person negligent as a matter of law. (Andre
 
 v.
 
 Allynn,
 
 84 Cal.App.2d 347, 352 [190 P.2d 949].) Where a person must work in a place of possible danger the amount of care he is bound to exercise for his own safety may well be less by reason of the necessity of his giving attention to his work than would otherwise be the case.
 
 (Austin
 
 v.
 
 Riverside Portland Cement, Co.,
 
 44 Cal.2d 225, 239 [282 P.2d 69].) Cases in which it can be said that negligence of the plaintiff contributes proximately to the accident as a matter of law are rare.
 
 (Anthony
 
 v.
 
 Hobbie,
 
 25 Cal.2d 814, 818 [155 P.2d 826].) ” (Emphasis added.) As to the matter of assumption of risk, Mr. Justice Vallée stated at page 411: “The two essential elements of the doctrine of assumption of risk are voluntary exposure to danger, and
 
 actual, not merely constructive, knowledge and appreciation of the risk assumed. (Austin
 
 v.
 
 Riverside Portland Cement Co.,
 
 44 Cal.2d 225, 235 [282 P.2d 69]; 35 Cal.Jur.2d 814, § 266.) ” (Emphasis added.)
 

 The judgment of nonsuit is affirmed as to the second and third causes of action as set forth in the third amended complaint and is reversed as to the first cause of action of that complaint.
 

 Shinn, P. J., and Files, J., concurred.
 

 [1]
 

 At the page cited, Prosser states: “But some few courts occasionally have enlarged the inference into an ‘unbending test’ of negligence, under which the ordinary usages of a business or industry become -the sole criterion as to what the actor should have done.
 

 “Such an arbitrary rule can scarcely be justified. Customs which are
 
 *259
 
 entirely reasonable under the ordinary circumstances which give rise to them may become unreasonable in the light of a single fact in the particular ease. It may become highly dangerous to follow the usual practice of bumping railroad cars together, on a day when brakemen must stand on top of ears which are covered with ice. But beyond this, customs and usages themselves are many and various; some are the result of careful thought and decision, while others arise from the kind of inadvertence that is associated with negligence. Even an entire industry, by' adopting careless methods to save time and effort or money, cannot be permitted to set its own uncontrolled standard. And if the only test is to be what has been done before, no industry will have any great incentive to make progress in the direction of safety. Much the better view is that of the great majority of the eases, that every custom must meet the challenge of 'learned reason,’ and can have only the evidentiary weight which its nature deserves; and that where common knowledge will recognize unreasonable danger, what everyone does may be found to be negligence.
 
 ’ ’