[Civ. No. 7333. Fifth Dist. Oct. 26, 1983.]

LUCIA DeLEON, Plaintiff and Appellant, v.
COMMERCIAL MANUFACTURING AND SUPPLY COMPANY,
Defendant and Respondent.

## Counsel

Richard Devirian and Gretchen Guzman for Plaintiff and Appellant.

Parichan, Renberg, Crossman & Harvey and Stephen T. Knudsen for Defendant and Respondent.

## Opinion

**WOOLPERT, J.**—Is custom-made factory equipment which is safe to use in some locations "defective" because in a particular location its use may bring the operator in contact with an adjacent rotating line shaft built and maintained by the plant owners? In this case the trial court granted a summary judgment in favor of the defendant equipment manufacturer on the theory that the manufacturer was not responsible for choosing the location of the equipment in the fruit processing line; therefore, the equipment, having no inherent defect, could not be the cause of the plaintiff-employee's injury. We reverse the judgment on both the strict liability and negligence theories urged by plaintiff, there being issues of fact.

In her complaint plaintiff Lucia DeLeon alleged that while acting within the scope of her employment with California Canners and Growers (Cal Can), she was injured when her right arm was traumatically severed by defective equipment negligently designed, constructed, sold, distributed and maintained by respondent Commercial Manufacturing and Supply Company (Commercial.) Our factual statement is taken from the excerpts of depositions attached in support of the motion for summary judgment and from uncontradicted portions of the pleadings.

On August 13, 1980, plaintiff was cleaning a shaker bin or holding bin at the Cal Can plant when her arm got caught in an exposed rotating line shaft and was traumatically severed from her body.

The holding bin which plaintiff was cleaning functions as a reservoir to hold peaches when there is a work stoppage in the line on which the peaches are sorted, cleaned and canned. When in operation, the bin shakes at a very slow speed on eccentric bearings; this vibration moves the peaches forward onto a conveyor belt, to be sorted by cannery workers. A latch on one side of the bin allows the front plate to be moved to facilitate washing. The cleanup worker could safely stand on a platform, which appears to be the

platform the cannery workers stand on to reach the conveyor belt, and use water from high pressure nozzles on a hose to reach the back of the bin.

An overhead line shaft is located approximately three feet above the bin. The shaft is attached to and supplies power for a small elevator adjacent to the bin. It has nothing to do with operation of the bin and was both manufactured and installed by Cal Can in 1961.

Plaintiff testified she had climbed onto the belt, which was stationary at the time, and was standing in front of the bin hosing it down when her arm got caught in the line shaft. No one had instructed her about safe work habits. She could not recall exactly where her feet were positioned at the time. After the accident, the line shaft was enclosed with covers made and installed by Cal Can.

The bin is one of several specially manufactured by Commercial to replace older, obsolete bins. At the time of the accident, Commercial had an ongoing relationship to sell parts or make materials for Cal Can. Although there was nothing complex about designing or manufacturing the bins which would prevent Cal Can from making them, Cal Can did not have the time to make the number of bins required, so it contracted the work out to Commercial.

Nate Hagopian went to Cal Can on behalf of Commercial to see the prototype bin which Cal Can had made and had set up for operation. He made pencil sketches of the bin, measured the bin and its associated parts, then drew up a diagram of a proposed product which was similar to the prototype bin but was constructed differently. This drawing was submitted to and approved by Cal Can plant manager Olympia Marrozzo. The length and height of the bins were specially made to fit the particular requirements of Cal Can's system. When the bins were completed, Cal Can picked them up and installed them in the plant.

Nate said he had seen the bins twice since their installation while on visits to the plant, but had never seen them in operation. He had never noticed the shaft overhead, did not know what it was, and had not been interested in it because it had nothing to do with the product which Commercial built. He had no formal engineering background, such as design or engineering courses, but had learned his trade through practical experience.

Declarations of other Commercial employees who might have had reason to visit the Cal Can site—Lawrence Hagopian, vice president; Harry Hagopian, a consultant; and Tom Gooding, an independent sales representa-

tive—indicated they too had never "noticed" the line shaft before the accident occurred.

In opposition to the motion for summary judgment, plaintiff attached the declaration of Martin Siegel, a mechanical engineer and professor at the University of Southern California. Siegel stated that a design engineer should design and manufacture equipment so that it can be safely operated and cleaned in the area in which it is to be installed. It is below the standard of practice to design equipment without considering hazards from adjacent equipment or components. Furthermore, a trained engineer and prudent manufacturer would have investigated the area surrounding the bin, noticed the dangers from the unguarded line shaft, and taken protective measures such as relocating the line shaft or bins, or recommending that a warning be placed on or near the bin.

■ The purpose of summary judgment procedures is to protect the parties from spurious or meritless complaints or answers and to expedite the administration of justice by eliminating unnecessary trials. (*Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 625 [157 Cal.Rptr. 248]; *McCreery* v. *Eli Lilly & Co.* (1978) 87 Cal.App.3d 77, 81 [150 Cal.Rptr. 730].) The rules relating to summary judgment are well settled and need not be repeated here. (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].)

## STRICT LIABILITY

In determining whether a summary judgment should be granted a defendant it is important to distinguish between legal and factual issues. An attempt to state the respective positions of the parties may be quite revealing. Here, Commercial believes that its mere manufacture of the bin according to the purchaser's specifications, and its subsequent assembly into the fruit processing line by the purchaser, placed the full responsibility for safe operating conditions in the hands of the plant operator, assuming of course that the bin itself had no defect.

Plaintiff contends the bin was designed for use in a certain location and therefore the "product" is not to be considered separate and apart from its surroundings.

The law may support both positions. However, assuming we correctly state the parties' contentions, each party presents an important variation in the facts. Commercial assumes it had little or nothing to do with the safe operating conditions of the fruit processing line; it merely filled an order

for a specific piece of equipment with no responsibility for its use. Plaintiff urges facts showing the plant operator relied on the expertise of Commercial when it invited Commercial employees to come to the plant to view the proposed bin configuration and to construct it properly as a part of the ongoing plant operation. Therefore, we do not have a clear-cut legal question of component part liability, but instead find a factual issue of involvement in design which will permit variations in the applicable rules of law depending upon how the trier of fact determines the extent of Commercial's design responsibility.

Plaintiff has the burden of showing that the product was in a defective condition and that the allegedly defective product proximately caused the injury. (*Miller* v. *Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 704 [106 Cal.Rptr. 1, 505 P.2d 193].) Further, plaintiff's injuries must be caused by a defect in the product. (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 733 [144 Cal.Rptr. 380, 575 P.2d 1162].) **(3)** However, strict liability encompasses both design and manufacturing of a product. (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 64 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; *Thomas* v. *General Motors Corp.* (1970) 13 Cal.App.3d 81, 88 [91 Cal.Rptr. 301].)

The problem with the defective design approach is that the bin itself was not defective and its design did not create the danger in the sense that the bin became dangerous. Instead, the design of the bin may have made it dangerous only in the context of adjacent machinery, i.e., the line shaft, which was unrelated to the bin's operation or use. Although plaintiff contends that a product can be defective when integrated in a system, the context of the case from which she extracts this proposition is not the same. In *Daly* v. *General Motors Corp., supra,* 20 Cal.3d 725, a plaintiff sued the manufacturer of a car with an allegedly defective component. The court upheld an instruction which required jurors to consider the automobile as a whole rather than isolating the defective component, and to consider whether other safety features in the automobile made it nondefective. The present case would be analogous only if a defective component of the bin possibly made the bin as a whole defective.

A duty to warn or disclose danger arises when an article is or should be known to be dangerous for its intended use, either inherently or because of defects. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 607, p. 2888.) Failure to give a warning may create liability for the harm caused by the use of an unreasonably dangerous product. (*Garman* v. *Magic Chef, Inc.* (1981) 117 Cal.App.3d 634, 638 [173 Cal.Rptr. 20]; *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 53 [46 Cal.Rptr. 552].) "[A]

product, although faultlessly made, may nevertheless be deemed 'defective' under the rule and subject the supplier thereof to strict liability if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied and no warning is given." (*Canifax, supra,* at p. 53.) ■ A product may be defective in design if it fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or, even if it satisfies an ordinary consumer's expectations, if it embodies "excessive preventable danger," i.e., the risk of danger inherent in the challenged design outweighs the benefits. (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 118 [184 Cal.Rptr. 891, 649 P.2d 224]; *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 430 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].)

■ In this case, as part of a network of food processing equipment, the intended use of the bin included regular cleaning. Thus, the bin's design could present an excessive preventable danger in its intended use because of its proximity to the line shaft. Although the designer may contemplate cleaning will be by a safe method built into the machinery, it may be foreseeable that workers will resort to alternative, less safe means because of the time or trouble involved using the "safe" way. Again, factual issues are presented.

Commercial contends that plaintiff did not need to be standing on the conveyor belt to clean the bin and could instead have removed the front panel of the bin and cleaned it from the platform on which cannery workers stand. However, the important factor is whether it is foreseeable that someone would climb onto the belt to get next to the bin for hosing it down— Commercial did not show that such an act was unforeseeable, so even if plaintiff's acts constituted misuse of the product, if her acts were foreseeable, Commercial is not absolved of blame. (*Thomas* v. *General Motors Corp., supra,* 13 Cal.App.3d at p. 89.) "The design and manufacture of products should not be carried out in an industrial vacuum but with recognition of the realities of their everyday use." (*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 126 [104 Cal.Rptr. 501 P.2d 1153].)

■ Moreover, even if plaintiff's acts could be considered misuse of the product and contributory negligence, this would not foreclose an action in products liability but only reduces any award she might receive in an amount proportionate to the degree she is deemed to be at fault. (*Daly* v. *General Motors Corp., supra,* 20 Cal.3d at p. 742.)

■ Did the bin cause or create the risk of harm—was there some unreasonably dangerous condition or feature of the bin which caused the in-

jury? Commercial argues that even if the holding bin is a component part of the entire canning system, there is no strict liability where the component is without defect, citing *Wiler* v. *Firestone Tire & Rubber Co., supra,* 95 Cal.App.3d 621. In *Wiler,* summary judgment was granted in favor of the tire manufacturer when the cause of an accident was determined to be not the tire, but a defective valve stem which Ford Motor Company had manufactured and attached to the tire. There was no defect in the component part, the tire. The court noted Firestone was dealing with an auto manufacturer which designed and produced automotive products and could reasonably believe that Ford would take appropriate measures to insure the proper design and installation of the valve stem. (*Id.,* at p. 629.)

Under the facts presented below, *Wiler* is distinguishable because Ford Motor Company's handling of automotive parts is not comparable to Cal Can's handling of canning machinery. Cal Can was not a parts manufacturer which designed and produced machinery as Ford designed and produced cars. Furthermore, Nate Hagopian's declaration contradicts any assertion that Cal Can had engineering expertise; when explaining why Commercial used a different construction for the bin than that used with the prototype, he said, "Well, the bracing, and all that, were different, because they're not much of an engineer there. They just leave it up to me to—."

The Cal Can representative was asked: "And those specifications were then supplied to Commercial Manufacturing?" He responded: "Not necessarily the specifications, but the idea of what we wanted, and they're experts in the field of shakers of this type, and we used their expertise." It is uncontradicted that the Commercial "designer" came to the plant and made measurements for construction purposes. Whether he should have observed the surroundings is a factual question.

In *Garman* v. *Magic Chef, Inc., supra,* 117 Cal.App.3d 634, a gas stove ignited leaking gas from defective tubing in a mobile home, causing damage and personal injury. Summary judgment in favor of the stove manufacturer was upheld on appeal because there was nothing unreasonably dangerous about the stove. The question before the trial court was "whether as a matter of law the stove manufacturer had a duty to warn that a lighted but properly operating stove might ignite gas leaking from some other place." (*Id.,* at p. 637.) Another product, not the stove, was held to be the defective product. The court rejected the notion that a product manufacturer could be liable "for merely failing to warn of injury which may befall a person who uses that product in an unsafe place or in conjunction with another product which because of a defect or improper use is itself unsafe." (*Id.,* at p. 638.) It could be argued that the bin in this case is analogous to the stove in

*Garman*—the bin itself was not dangerous but only became so when used in an unsafe place.

Perhaps the elevated exposed line shaft was at one time of no risk to workers. However, in combination with the bin—the need to clean the bin, steps nearby, a conveyor belt which when stopped would become a temporary higher platform for cleaning the bin—the rotating line shaft became a danger. At that time the entire system became a source of danger to the worker. Irrespective of the significance in some cases of the nature and extent of the "product"—whether the bin or the bin and its surroundings—the principal issue of fact presented below was that of responsibility for design, including location.

The bin's dimensions and proximity to the line shaft were material to the accident. In its brief, Commercial admits: "While plaintiff emphasizes defendant's modification of the bracing for the holding bins . . . , the important dimension for purposes of the lawsuit is their height. It was the bin's height which made it possible by standing in front of the bin for plaintiff to contact the unguarded line shaft. The height of the bin was predetermined by the requirement that they fit into Cal Can's production line."

We agree that particular elements of the bin's design might be considered to have caused or created the risk of harm by making contact with the adjacent line shaft during cleaning a foreseeable risk.

■ Furthermore, Commercial's argument that the bin was made to fit Cal Can's production line and follow the pattern of the prototype bin is not a defense. (*Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890, 897 [159 Cal.Rptr. 119].) In *Rawlings,* the defendant manufacturer of a kelp drying machine asserted that a strict liability theory was inapplicable because the product was not mass produced, but was a special piece of equipment made by its predecessor in accordance with the purchaser's plans. This argument was rejected by the appellate court: "Concern for victims is stated to be the 'paramount policy' to be promoted by strict products liability. (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722].) Its purpose is also to transfer the cost of injuries caused by defective products from the injured person, powerless to protect himself, to the manufacturer (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 63), thus spreading the cost of compensating victims throughout society as a cost of doing business by the manufacturer. (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, pp. 18-19 [45 Cal.Rptr. 17, 403 P.2d 145].)

"Defendant's predecessor does not appear to have been an occasional seller. (Rest.2d Torts, § 402A, com. f.) It appears to have been engaged in

manufacturing and selling products as part of its full time commercial activity. The uniqueness of Kelco's order may not alter its responsibilities. [Citation.]" (*Rawlings* v. *D.M. Oliver, Inc., supra,* 97 Cal.App.3d at pp. 897-898.)

Similarly, Commercial was not an occasional seller but was manufacturing and selling machinery parts as a full-time commercial activity and the uniqueness of Cal Can's order did not alter Commercial's responsibilities.

Neither party afforded the trial court, or us, with citation to *Hyman* v. *Gordon* (1973) 35 Cal.App.3d 769 [111 Cal.Rptr. 262], cited with approval in *Daly* v. *General Motors Corp., supra,* 20 Cal.3d at page 746. We find the *Hyman* facts and statement of law to be more helpful to us than those in *Garman* v. *Magic Chef, Inc., supra,* 117 Cal.App.3d 634, which was faced with the rather limited question of responsibility for mass-produced stoves to be located according to the users' plans.

In *Hyman* the trial court committed reversible error in entering a nonsuit against plaintiff, where it appeared that defendant was actively engaged in the design and building of homes and located a water heater in an improper location. Injuries resulted from spilled gasoline coming into contact with the heater. The water heater was not defective. The court affirmatively answered the issue it stated to be: "[W]hether an allegedly defective location for an article may give rise to application of the doctrine of strict liability in tort." (*Hyman* v. *Gordon, supra,* 35 Cal.App.3d at p. 772.) We quote further: "It is possible that an article or a machine may function safely in one location in the design but not another. . . . The determination of whether the presence of the water heater in the garage location constituted a defective design, and the foreseeability of harm resulting therefrom, should have been left to the jury. It was for the jury to balance the likelihood of harm and the gravity of the harm as opposed to the burden of precautions which would effectively have avoided it. [Citations.]" (*Id.,* at p. 773.)⁻

▇ Whether Commercial could rely on Cal Can to protect a worker from adjacent dangers during the cleaning process, and even the duty of Commercial to anticipate safety neglect by Cal Can, should be resolved by the trier of fact, again assuming that Commercial participated in the design of this custom-made equipment for a particular location in a processing line. (*Balido* v. *Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 645 [105 Cal.Rptr. 890] (questioned on other grounds in *Regents of University of California* v. *Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624, 641 [147 Cal.Rptr. 486, 581 P.2d 197]; disapproved on other grounds in *Foglio* v. *Western Auto Supply* (1976) 56 Cal.App.3d 470, 476 [128 Cal.Rptr. 545]).)

The testimony of Professor Siegel also protected plaintiff from a summary judgment. His expert testimony assumed the fact that Commercial was responsible for the design. If in fact Commercial was responsible for designing a product to be cleaned in a foreseeable manner, the expert's opinion that the designer should anticipate certain risks and take certain precautionary steps to avoid them was for the jury to consider, not the court. No question was presented concerning the expert's qualifications. The court could not disregard the expert opinion in ruling that no issues of fact were present.

■ It is reversible error to refuse expert testimony concerning the necessity and feasibility of certain design changes to enhance the safe operation of machinery. (*Varas* v. *Barco Mfg. Co.* (1962) 205 Cal.App.2d 246, 259-261 [22 Cal.Rptr. 737].) Such expert opinion may include testimony that the equipment was improperly located in its environment. (*Hyman* v. *Gordon, supra,* 35 Cal.App.3d at p. 774.)

■ Therefore, issues of fact were present; the motion should not have been granted on the strict liability cause of action.

While writing this opinion we have noted with interest the current publication of an informative article by Professor John L. Diamond in 34 Hastings Law Journal 529 (1983), entitled *Eliminating the "Defect" in Design Strict Products Liability Theory.* Unfortunately, the opinion we write today will do nothing to reduce the analytical debate which results when traditional strict liability, warranty, and negligence are mixed to form an umbrella prompted by social considerations.

Dean Prosser has not overlooked this melding of legal theory. In reference to product design, he notes that it is one of "two particular areas in which the liability of the manufacturer, even though it may occasionally be called strict, appears to rest primarily upon a departure from proper standards of care, so that the tort is essentially a matter of negligence." (Prosser, Law of Torts (4th ed. 1971) p. 644, fn. omitted.)

Similarly, in *Balido* v. *Improved Machinery, Inc., supra,* 29 Cal.App.3d at page 640, the court observed that in deficient design cases "strict liability and negligence claims merge." With these comments in mind we move to the cause of action based on negligence.

### NEGLIGENCE

■ Plaintiff contends Commercial had a duty to warn of foreseeable danger involved in cleaning the bin which it designed. Commercial argues

it cannot be liable under a negligence theory because it had no duty to protect the plaintiff from the line shaft: Commercial had no relationship with plaintiff, no notice of the line shaft and its dangerousness, Cal Can had expertise in engineering and had manufactured and installed the line shaft, and Commercial had no control over Cal Can's business operation. ■ "The duty of a manufacturer with respect to the design of products placed on the market is defined in the Restatement Second of Torts, section 3298: 'A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.' Thus, the manufacturer must use reasonable care ' "to so design his product as to make it not accident-proof, but safe for the use for which it was [*sic*] intended." ' [Citation.] What is 'reasonable care,' of course, varies with the facts of each case, but it involves a balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm. [Citation.]" (*Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 470 [85 Cal.Rptr. 629, 467 P.2d 229].)

■ As Cal Can's employee, plaintiff would be expected to be endangered by the bin if it were defective; this satisfies the relationship requirement. Next, that Commercial's employees professed ignorance of the existence of the shaft and its dangerous propensities would not constitute a defense if they *should* have noticed it. ■ "There is no dispute that the seller is under a duty to give adequate warning of unreasonable dangers involved in the use of which he knows, or should know." (Prosser, Law of Torts (4th ed. 1971) pp. 646-647, fns. omitted.) ■ The declaration of Professor Siegel that a trained engineer would have recognized the danger posed by the line shaft would support a finding that Commercial should have noticed the danger, assuming again the threshold finding of design responsibility.

Perhaps Commercial had no control over Cal Can in the sense that it could not insure Cal Can would heed any warnings given or alter the line shaft. ■ "As a general proposition it can be said that a manufacturer who has taken all reasonable steps to correct its error may succeed in absolving itself from future liability." (*Balido* v. *Improved Machinery, Inc.*, *supra*, 29 Cal.App.3d at p. 648.) In *Balido*, the reasonableness of the measures taken by a manufacturer to introduce safety devices on its older, admittedly defective machinery was considered to be a question of fact on the issue of superseding cause. (*Id.*, at p. 647.)

Although Commercial argues that its lack of control over Cal Can would militate against the imposition of any duty, the cases which it cites for this proposition are inapposite. In *Harris* v. *De La Chapelle* (1976) 55 Cal.App.3d 644 [127 Cal.Rptr. 695] (questioned on other grounds in *Sprecher* v. *Adamson Companies* (1981) 30 Cal.3d 358, 372, n. 9 [178 Cal.Rptr. 783, 636 P.2d 1121]), the appellant was injured when the driver of another automobile was unable to see a stop sign obscured by a hedge and collided with appellant's car. The court held that no duty could be imposed on property owners along the entire hedge who could not have controlled the actions of the city or the owner of the particular part of the hedge which obscured the stop sign. (*Id.,* at p. 648.) These other landowners had nothing to do with the conditions which caused the harm involved. In contrast, it may be shown that Commercial had designed the bin in such a way that the plaintiff was exposed to harm from the adjacent line shaft, and was therefore directly involved in the accident.

The second case cited by Commercial, *Schauf* v. *Southern Cal. Edison Co.* (1966) 243 Cal.App.2d 450 [52 Cal.Rptr. 578], involved the nonliability of the power company for obscuring a stop sign with a power pole when the pole was positioned there first. The court considered it the county's sole responsibility to properly locate the sign, even though the power company was aware of the sign and the possibility of relocating the pole. (*Id.,* at pp. 460-462.) However, in the present case, Commercial did not design the bin before Cal Can constructed and located the line shaft.

With only slight editing we could take our discussion of the strict liability cause of action and convert it into the language of negligence. The same summary judgment rationale applies when the products liability window dressing is removed. As the cited authors have observed, in this factual setting the two theories merge. The same factual issues appear, requiring trial on both causes of action rather than summary judgment.

The judgment is reversed.

Andreen, Acting P. J., and Hamlin, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied December 22, 1983.