[No. E002943. Fourth Dist., Div. Two. July 10, 1986.]

GEHL BROTHERS MANUFACTURING COMPANY et al.,
Petitioners, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
SELMA TRAILER & MANUFACTURING CO., Real Party in Interest.

## COUNSEL

Federman, Gridley, Mogab & Gradwohl, Bruce Gridley, Horvitz & Levy, Barry R. Levy, George P. Schiavelli, Millard, Stack & Stevens and Daniel L. Stack for Petitioners.

No appearance for Respondent.

Latham & Watkins, John J. Lyons and Laurence Hummer for Real Party in Interest.

## OPINION

**McDANIEL, J.**—In these original proceedings, we are called upon to review the propriety of a trial court's order which determined that plaintiff's settlement with one of three alleged joint tortfeasors had been entered into in good faith. Analyzed in light of the applicable *Tech-Bilt* (*infra*) factors, it is our view that the trial court erred in determining, as a threshold matter, that the defendant with whom plaintiff settled could be assigned no liability for plaintiff's injuries as a matter of law. The facts before the trial court readily revealed a likely possibility that a jury could assess substantial liability to the settling defendant, should that defendant be held in the case, with the result that the settlement could not have been effected in good faith. Therefore, the order will be reversed.

### FACTS

Plaintiff Jose Guzman, a 61-year-old farm worker, was badly injured when he became entangled in the exposed drive shaft linking his tractor with a forage unloading farm wagon.

The underlying action which followed was based on negligence, strict products liability, and breaches of warranty. The three named defendants therein had been collectively involved in the manufacture and distribution of the forage unloading farm wagon. To determine the various capacities

of defendants in their production of the wagon, really the bone of contention in this proceeding, requires a precise understanding of the machinery plaintiff was operating at the time of his injury.

Plaintiff was driving a standard farm tractor, one with the capacity to power another piece of machinery by means of a so-called power takeoff rotated by the tractor's engine. Hitched to plaintiff's tractor was a farm wagon, in visual configuration much like the toy wagons pulled by children. This wagon was manufactured by defendant Selma Trailer & Manufacturing Co. (Selma), the party who settled with plaintiff. On this wagon defendant Gehl Brothers Manufacturing Company's (Gehl) product, a "Self-Unloading Forage Box," had been installed. The Gehl unit consisted of a large, open-topped, wooden box, with slatted sides, in which forage was loaded for delivery into feeding troughs. Built into the box were beaters and conveyor belts which separated the forage and moved it to the front of the wagon. The forage would then be dispensed in a slow, continuous stream through a chute, located above the front wheel on the left side of the wagon, and into the troughs.

The beaters and conveyor belts required power, which was supplied by a drive shaft leading from the front of the forage box directly into the power takeoff located on the rear of the tractor. In terms of their respective horizontal planes, the drive shaft and the tongue of the wagon were roughly parallel to one another, the plane of the drive shaft being approximately a foot above the plane of the tongue of the wagon. As a consequence, if one stood on the tongue of the wagon, his lower legs would be within inches of the drive shaft. Normally, both the drive shaft and the universal joints linking it to the tractor and forage box were completely encased by removable safety guard housings. All of these parts were components of the forage box manufactured by defendant Gehl. However, on the day of plaintiff's injury, none of the safety guard housings were in place.

The sequence of events leading to plaintiff's injury is undisputed. One rainy afternoon, plaintiff was slowly driving the tractor-wagon unit alongside a line of cattle feeding troughs, unloading cabbage leaves from the forage box into the troughs. He saw a shovel in the path of his tractor and hopped down off the tractor to move it aside. Before dismounting, plaintiff put the gears of the tractor in neutral, but failed to disengage the power takeoff. As a result, the exposed drive shaft between the tractor and the unloading forage box continued to rotate as the tractor-wagon unit stood still. After moving the shovel, plaintiff decided to check visually the contents of the box, a procedure he could and usually did accomplish from his perch atop the tractor. However, instead of getting back on the tractor, or using the

wagon's ladder, mounted next to the chute, plaintiff either stood on the ground near the wagon or stepped up on the tongue of the wagon to peer into the forage box; he was unable to recall which. In any event, the exposed, rotating drive shaft snatched up the edge of plaintiff's rain jacket, and he was later found unconscious, slumped over the drive shaft.

After extensive depositions and other discovery, plaintiff settled for $10,000 with Selma, the wagon manufacturer. Selma then moved for an order to have the settlement declared in good faith, and also dismissing Gehl's cross-complaint against Selma, as well as Selma's cross-complaint against Gehl, both seeking indemnity. The trial court found the settlement value of the case to be between $1.5 and $2.5 million, subject to reduction by an estimated 30 to 60 percent for plaintiff's contributory negligence. However, because the trial court determined Selma's potential liability to be "remote," it declared the settlement for $10,000 to have been entered into in good faith and granted Selma's motion.

## DISCUSSION

Parenthetically, petitioners Gehl and Meyer-West raise the objection that Selma failed to file a proper return, instead filing only points and authorities in opposition. Because Selma's points and authorities in opposition do include factual allegations and record references ample to the decisional task called for in this writ proceeding, we deem Selma's submission adequate for this case. Furthermore, it ill behooves petitioners to attempt to exploit a technical defect, when they likewise have been guilty of technical dereliction, namely, a failure initially even to establish the court's jurisdiction in this matter.[1]

■ Turning to the merits, the standards for determining the good faith of a settlement under Code of Civil Procedure section 877.6 were enunciated by the Supreme Court in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159].

"A more appropriate definition of 'good faith,' in keeping with the policies of *American Motorcycle* and the statute, would enable the trial court to inquire, among other things, whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries. This is not to say that bad faith

---

[1] When filed, the petition was untimely on its face. Rather than deny it out of hand, we inquired if there had been an order from the trial court extending petitioners' time to file. There was, and petitioners supplied us with a copy, although not certified. 'Nuff said.

is 'established by a showing that a settling defendant paid less than his theoretical proportionate or fair share.' (Cf. *Dompeling, supra,* 117 Cal.App.3d at p. 809.) Such a rule would unduly discourage settlements. 'For the damages are often speculative, and the probability of legal liability therefor is often uncertain or remote. And even where the claimant's damages are obviously great, and liability therefor certain, a disproportionately low settlement figure is often reasonable in the case of a relatively insolvent, and uninsured, or underinsured, joint tortfeasor.' (*Stambaugh* v. *Superior Court* (1976) 62 Cal.App.3d 231, 238 [132 Cal.Rptr. 843].) Moreover, such a rule would tend to convert the pretrial settlement approval procedure into a full-scale minitrial (cf. *Dompeling, supra,* 117 Cal.App.3d at p. 810 [173 Cal.Rptr. 38]).

"But these considerations do not lead to the conclusion that the amount of the settlement is irrelevant in determining good faith. Rather, the intent and policies underlying section 877.6 require that a number of factors be taken into account including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. (See *In re MGM Grand Hotel Fire Litigation* (D.Nev. 1983) 570 F.Supp. 913, 927.) Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement." (*Id.,* at p. 499.)

█ In its order, the trial court in the case here specifically found that there were no coverage problems (which presumably includes insolvency, lack of insurance, and under insurance) and that there was no fraud or collusion. There also appears to be no speculative damage difficulty, leaving only three factors to consider: (1) an approximation of plaintiff's total recovery; (2) the defendants' proportionate liability *inter se*; and (3) a recognition that the amounts paid in settlement are smaller than those paid on a recovery. Because Selma paid $10,000, less than 1 percent of any potential settlement liability, the trial court necessarily must have concluded that the settlement was appropriate as a "cost of defense settlement," *predicated upon no liability as a matter of law.* Therefore, to uphold the trial court's ruling, it would be necessary to hold that the record supports a determination that Selma can be assigned no portion of liability as a matter of law. Accordingly, our determination that Selma could face possible li-

ability exposure on any one of plaintiff's four causes of action would render the trial court's ruling erroneous, and require reversal of the order.

We examine first the strict products liability cause of action brought against all defendants. Meyer-West, the distributor of the complete wagon/forage unloader unit, and Gehl, manufacturer of the forage unloader, advance a number of factual arguments purporting to show Selma has liability exposure. They all can be classified under one of four categories: (1) that Selma's wagon was defectively designed; (2) Selma failed to warn of dangerous defects in the wagon; and (3) as the manufacturer of the complete wagon/forage unloader, Selma is liable for defects in any of the components used, including Gehl's forage box. Selma, on the other hand, contends: (1) Gehl's forage box was defectively designed; (2) Gehl, as manufacturer of the complete wagon/forage unloader, was responsible for defects in any of the components used, which includes Selma's wagon; (3) Gehl failed adequately to warn of dangerous defects, and (4) Meyer-West, the distributor, was liable for not properly warning operators of the unit concerning the hazards of operation and not specifying appropriate safety procedures.

Neither party's position is particularly persuasive. In our view, the facts critical to a determination of the defendants' liability exposure *inter se* are these: (1) the Gehl manual states that its forage box can fit on *any* standard wagon, not just the Selma wagon; (2) Gehl's distributor, Meyer-West, *asked* Selma to design a particular wagon to enable marketing of the wagon and forage unloader as a package, and, in response to this request, Selma designed a prototype, which was turned over to Meyer-West; (3) Meyer-West tested and expressed satisfaction with the wagon, leading Selma to manufacture one hundred wagons, which it sold only to the distributor; (4) the final integration of the wagon with the forage unloader was the responsibility of Meyer-West, who by separate contract asked Selma to install the forage unloader on about half of the wagons. From these facts, it is clear that neither Selma, on one hand, nor Gehl and Meyer-West, on the other, were manufacturers of a finished product for which the other supplied a component part.

This factual situation here does not match the hierarchical manufacturer/supplier model, one which presupposes a manufacturer who designs and manufactures a complete product, and contracts out to suppliers for various subassemblies to incorporate into it. The relationship among the defendants is much more like that of joint business venturers who collaborate variously to create one marketable product. Consequently, without assigning proportionate liabilities, it is also clear that *all of these defendants,* as cofabricators of a finished product, have *potential* design defect and duty-

to-warn liabilities, the extent of which must be resolved by the trier of fact. (Cf. *DeLeon* v. *Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 342-343 [195 Cal.Rptr. 867].)

After a summary judgment in favor of defendant bin manufacturer, the court in *DeLeon* reversed and held that the plaintiff stated strict products liability and negligence causes of action under facts analogous to those here. There, the plaintiff was a worker in a fruit cannery. She was cleaning (not using the recommended method) a peach bin, when an exposed rotating drive shaft located three feet above the bin caught her arm and severed it. The cannery previously had asked an equipment manufacturer to design the bin. Their designer had come to the plant, looked over the area in which the bin was to be located, and ultimately the bin was designed and installed. The exposed drive shaft did not service the bin. However, the shaft was exposed and visible to anyone looking over the area of the cannery in which the bin was to be located. The court stated: "Here, Commercial [bin manufacturer] believes that its mere manufacture of the bin according to the purchaser's [cannery's] specifications, and its subsequent assembly into the fruit processing line by the purchaser, placed the full responsibility for safe operating conditions in the hands of the plant operator, assuming of course that the bin itself had no defect.

"Plaintiff contends the bin was designed for use in a certain location and therefore the 'product' is not to be considered separate and apart from its surroundings.

"The law may support both positions. However, assuming we correctly state the parties' contentions, each party presents an important variation in the facts. Commercial assumes it had little or nothing to do with the safe operating conditions of the fruit processing line; it merely filled an order for a specific piece of equipment with no responsibility for its use. Plaintiff urges facts showing the plant operator relied on the expertise of Commercial when it invited Commercial employees to come to the plant to view the proposed bin configuration and to construct it properly as a part of the ongoing plant operation. *Therefore, we do not have a clear-cut legal question of component part liability, but instead find a factual issue of involvement in design which will permit variations in the applicable rules of law depending upon how the trier of fact determines the extent of Commercial's design responsibility.*" (*Ibid.*, italics added.)

Selma can readily be substituted for the bin manufacturer, and Gehl and Meyer-West for the cannery, and the unhappy story reads practically the

same. For this reason, it cannot be said that Selma is not liable as a matter of law.

The rule which the foregoing analysis yields is that liability devolving upon a product manufacturer by reason of design defects, or by reason of failure to warn or failure to provide a safety device (see *Campbell* v. *General Motors* (1982) 32 Cal.3d 112, 118-120 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036]) falls in some proportion, to be determined by the trier of fact, on all parties who have mutually participated, in a dependent, interrelated way, in designing, assembling, and marketing the offending product.

Applying this rule to the facts here, Selma's potential share of liability, reduced to settlement value, where the total exposure has been estimated to be in seven figures, surely will exceed substantially the $10,000 settlement. As a result, the settlement does not meet the *Tech-Bilt* requirements, and so the order that the settlement was entered into in good faith cannot stand.

Because we hold Selma is potentially liable on the strict products liability cause of action, it is not necessary to consider the propriety of the trial court order with reference to plaintiff's other two theories of liability.

### Disposition

The petition is granted. Let a peremptory writ of mandate issue, directing the Riverside County Superior Court to vacate its order of February 4, 1986, in civil action No. 165825, and to enter a new and different order denying the motion for an order that the settlement between plaintiffs and defendant Selma was entered into in good faith. The alternative writ is discharged and petitioners shall be awarded their costs under section 1027 of the Code of Civil Procedure.

Rickles, Acting P. J., and Dorr, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.