[No. B023384. Second Dist., Div. Seven. Apr. 8, 1987.]

SEAMEN'S BANK FOR SAVINGS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
EILEEN J. SMITH et al., Real Parties in Interest.

**COUNSEL**

Hufstedler, Miller, Carlson & Beardsley, Seth M. Hufstedler, Dennis M. Perluss, Evelyn Balderman Hutt and Nancy C. Brown for Petitioner.

No appearance for Respondent.

Bostwick & Ackerman, Lee B. Ackerman, Rodi, Pollock, Pettker, Galbraith & Phillips, John P. Pollock, Thomas P. Phillips, Sonja A. Inglin, Robina R. Royer, Allred, Maroko, Goldberg & Ribakoff and John S. West for Real Parties in Interest.

OPINION

**JOHNSON, J.**—We issued an alternative writ of mandate to review the trial court's order overruling demurrers by the Seamen's Bank for Savings to cross-complaints filed by Eileen J. Smith, Beverly E. Hegg and John W. Smythe. We have now concluded a peremptory writ of mandate should issue directing the trial court to sustain the demurrers.

FACTS AND PROCEEDINGS BELOW

1. *Background*

The National Mortgage Equity Corporation (NMEC) marketed mortgage pass-through certificates to institutional investors including the Seamen's Bank for Savings (Seamen's). The certificates represented undivided interests in pools of secured real estate loans. Each certificate represented a number of individual loans collected into a pool by NMEC and sold to institutional investors for a price equal to the aggregate principal balances of the loans in the pool. The institution buying the certificate received a fixed rate of interest stated in the certificate.

Bank of America acted as escrow agent and trustee in connection with NMEC's issuance and marketing of the certificates. Nineteen institutions, including Seamen's, purchased over $233 million in certificates.

Several years after Bank of America undertook its escrow and trustee function Seamen's informed the bank of irregularities in the processing and documentation of transactions underlying Seamen's purchase of NMEC certificates. Bank of America initiated an investigation and found virtually all the loans that comprised the pools were worthless: the borrowers were in default; the real estate that supposedly secured the loan was fraudulently inflated in value; mortgage guarantee insurance did not exist; in some cases several loans were secured by the same property. The bank also concluded the investing institutions stood to lose all or most of the money they invested in the NMEC pools and this loss was caused by the bank's employees failing to use ordinary care, diligence and skill in performing their duties as escrow and trust officers with respect to the NMEC transactions.

Bank of America also recognized its employees' negligence rendered it liable to the investors for their losses. Therefore, the bank undertook settlement negotiations with the investors. As a result, the bank agreed to repurchase the certificates or replace the mortgages represented by the certificates. In return, the investors assigned to the bank all rights, claims, and causes of action they might have against bank officers, employees, agents or other

third parties responsible for their loss. The total amount paid by the bank in cash or replacement collateral to resolve its liability to the investors was approximately $133 million. The bank estimates the realizable value of collateral and mortgage guarantee insurance claims assigned to it is $38 million. Accordingly, the bank estimates its loss in resolving the liability to the investors is $95 million.

## 2. *Litigation*

### (a) *Bank of America versus its employees*

The underlying action is a suit by Bank of America seeking to recover from present and former employees its losses resulting from its settlement with the NMEC investors. Smith, Hegg and Smythe are three such employees.

The bank's complaint alleges Smythe was trust officer in the Los Angeles district trust office of the bank. Smythe was the bank officer principally responsible for the management, supervision and oversight of the trust services furnished by the bank in connection with the NMEC transactions. Hegg was the vice president and manager of the Inglewood main office of the bank. She was the bank officer principally responsible for the bank's management, supervision and oversight of escrow services provided in connection with the NMEC transactions. Smith was the trust administrator in the Inglewood office. She was the bank officer principally responsible for the administration of trusts pertaining to the NMEC transactions, including the review of mortgages and related trust documents. Smith, Smythe and Hegg thus had primary responsibility for administration of the bank's obligations as escrow agent and trustee for the NMEC investment accounts.

The bank alleges that Smith, Smythe and Hegg as officers of the bank were obligated to care for and control the NMEC transactions. Their duties included, for example, (a) reviewing all documents furnished to the bank for each loan to determine whether the documents had been properly executed and conformed to the requirements of the bank's agreement with NMEC; (b) notifying NMEC promptly in writing of any defect or deficiency or any breach by NMEC of its representations or warranties that materially and adversely affected the interests of the investors; (c) certifying the authenticity of the mortgage-backed securities issued by NMEC; and (d) exercising all rights and powers vested in the bank in the event of default.

According to the complaint, Smythe failed to read the NMEC agreements, to apply the bank's criteria or to supervise the bank's employees for protection of the investors. He signed receipts for items never received; he signed authentication certificates without underlying documentation; and he

permitted other employees to do the same. Smith performed her duties with a similar lack of care, failing to review documentation, to conduct trust account reviews, or otherwise to perform the duties with which she was charged to protect the interest of the investor institutions. Hegg likewise performed negligently by failing to ensure that there was adequate training, supervision and oversight of the personnel responsible for NMEC escrows.

### (b) *Bank of America employees versus the investors*

Defendants Smith, Hegg and Smythe filed cross-complaints against the defrauded investors including Seamen's.[1] The cross-complaints alleged that if Smith, Hegg and Smythe are liable to the bank they are entitled to indemnification from the investors on the grounds of equity and implied contract. The three defendants also seek declaratory relief as to the bank's settlement agreement with Seamen's.

The equitable indemnity claim is based on allegations the investors owed a general duty to the bank to act as reasonably prudent investors and owed specific duties to review the investments as set out in the escrow services contract and associated documents. The contractual indemnity claim is based on the theory the defendants, Smith, Hegg and Smythe, are third party beneficiaries of contracts executed by Seamen's. The three defendants allege, on information and belief, a controversy exists between them and Seamen's over whether Seamen's settlement agreement with the bank fully and finally extinguished all claims Seamen's may have against them arising out of the NMEC transactions.

### (c) *Demurrers to cross-complaints and petition for review*

Seamen's demurred to the cross-complaints of Smith, Hegg and Smythe on the ground the cross-complaints failed to state causes of action. The trial court overruled the demurrers. We took the extraordinary step of intervening in this case at the pleading stage because the cross-complaint alleges indemnification theories that go beyond the current law and if these theories are erroneously allowed to proceed substantial trial expenses would be needlessly imposed on the three cross-complainants, the nineteen investors and, indirectly, the public-at-large. (Cf. *San Diego Unified Port Dist.* v. *Superior Court* (1977) 67 Cal.App.3d 361, 364-365 [136 Cal.Rptr. 557].)

---

[1]The parties have agreed Seamen's demurrers will be the "test case" to determine the validity of the claims against the investors.

DISCUSSION

## I. A DEFENDANT HAS NO CAUSE OF ACTION FOR EQUITABLE INDEMNITY AGAINST THE VICTIM OF HIS OWN TORT

█ In *Munoz v. Davis* (1983) 141 Cal.App.3d 420, 425 [190 Cal.Rptr. 400], we observed, "[I]n the case law of equitable indemnity . . . one point stands clear: there can be no indemnity without liability." We went on to explain, "[U]nless the prospective indemnitor and indemnitee are jointly and severally liable to the plaintiff there is no basis for indemnity." (*Ibid.*; citations omitted.) Munoz was an attorney sued by a client for malpractice. Munoz claimed he was entitled to equitable indemnity from Davis because if Davis had not negligently injured Munoz's client Munoz never would have had the opportunity to commit malpractice in representing the client. (*Ibid.*) The bank employees make a similar argument in the case at bench. If Seamen's had acted as a reasonably prudent investor the NMEC transactions would never have reached their desks and they never would have had the opportunity to negligently perform their duties. We rejected Munoz's claim for equitable indemnity because Davis owed no duty to Munoz's client to ensure that his legal claims were competently prosecuted and because there was no equitable basis for shifting Munoz's liability to Davis. (*Id.*, at pp. 426-427.) We reject the bank employees' claims for similar reasons.

### 1. *Seamen's and the bank employees are not joint tortfeasors because Seamen's owed no duty of care to the bank*

The bank employees cite no case holding an investor owes a duty of care to an escrow agent and trustee to investigate a deal before or after investing. No such case is likely to appear unless a court is prepared to say the plaintiff is under an obligation to protect the defendant against liability for the consequences of the plaintiff's own negligence. (Prosser & Keeton on Torts (5th ed. 1984) p. 453.) To restate the bank employees' argument, it is: the plaintiff is required to act carefully in order that others may act carelessly. But, it has long been recognized "[t]he doctrine of contributory negligence cannot . . . be based upon a breach of duty to the negligent defendant." (*Ellerman Lines, Ltd.* v. *H. & G. Grayson, Ltd.* (1918) 2 K.B. [1919] 514, 535.) (See also, Bohlen, *Book Review* (1932) 80 U.Pa. L.Rev. 781, 784 (reviewing Green, Judge and Jury (1930).)

The bank employees contend Seamen's misrepresented to the bank it had investigated the mortgage loans covered by the NMEC certificates before agreeing to purchase the certificates. Assuming this is true, it was not the acceptance of Seamen's escrow and trust business that caused harm to the bank. It was the negligent performance by the bank employees in handling

this business that resulted in the bank's liability to Seamen's. This case is readily distinguishable from *Cicone* v. *URS Corp.* (1986) 183 Cal.App.3d 194 [227 Cal.Rptr. 887] in which the court allowed an action for equitable indemnity to proceed against a settling plaintiff. In *Cicone* the liability of the settling defendant was based on breach of warranty, not negligence, and the indemnity claim against the settling plaintiff was based on its intentional or negligent misrepresentation as to how it would construe the warranty. It was alleged this misrepresentation induced the settling defendant to enter into the contract with the settling plaintiff. Cicone, the party seeking indemnity from the settling plaintiff, contended the settling plaintiff was not a "victim" at all but intentionally or negligently set up a situation in which it could sue for damages on the warranty. In the case at bench, there is no allegation of fraud or intentional misrepresentation on the part of Seamen's. The bank employees' contention that Seamen's negligent misrepresentations induced the bank to enter into the escrow and trust agreements with NMEC is contradicted by the documents they incorporate into their cross-complaint. These documents show the escrow and trust agreements between the bank and NMEC were entered into *before* Seamen's agreed to purchase NMEC certificates. Therefore, Seamen's acts could not have been a factor inducing the bank to enter into the agreements with NMEC.

## 2. *There is no equitable basis for a tortfeasor's claim for indemnity from his victim*

■  The key ingredient in equitable indemnity is equity. "Where that element is missing, the complaint fails to state a cause of action and the question of how to apportion liability never arises." (*Munoz* v. *Davis, supra,* 141 Cal.App.3d at p. 428.)

We recognize Smith, Hegg and Smythe, the bank employees, have a legitimate interest in establishing Seamen's contributory negligence. The degree to which Seamen's fault *contributed to its own injury* bears directly on the proportion of fault attributable to the bank employees and, ultimately, their liability to the bank on its claims for indemnity and negligence. (See *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 558-591 [146 Cal.Rptr. 182, 578 P.2d 899]; *American Bankers. Ins. Co.* v. *Avco-Lycoming Division* (1979) 97 Cal.App.3d 732, 736 [159 Cal.Rptr. 70].) However, the place to litigate Seamen's fault is in the bank's action for indemnity against its employees, not in an indemnity action by the employees against Seamen's under the fiction Seamen's itself is a tortfeasor. (Cf. *Gehl Brothers Manufacturing Co.* v. *Superior Court* (1986) 183 Cal.App.3d 178, 181 [228 Cal.Rptr. 19].) Seamen's absence as a party in the litigation between the bank and its employees does not prejudice the employees.  ■  It is not necessary a person be a party to the action in order

for the court to assess that person's proportion of fault. (*American Motorcycle Assn., supra,* 20 Cal.3d at p. 589, fn. 2.) No elements of res judicata or collateral estoppel are present between the bank employees and Seamen's. Not only are the bank employees entitled to a trial on the merits they have the added benefit the settlement negotiated between the bank and Seamen's imposes a lid on the employees' potential liability which may be less than the sum Seamen's could have recovered in litigation against the bank.[2] (Cf. *American Bankers Ins. Co.* v. *Avco-Lycoming Division, supra,* 97 Cal.App.3d 732, 736.)

## II. THE CROSS-COMPLAINTS FAIL TO ALLEGE THE BREACH OF ANY CONTRACTUAL DUTY OWED, EVEN INDIRECTLY, TO THE BANK EMPLOYEES

We recognize there is conflict over whether a cause of action for implied contractual indemnity survived *American Motorcycle Assn.* (Cf. *Kramer* v. *Cedu Foundation, Inc.* (1979) 93 Cal.App.3d 1 [155 Cal.Rptr. 552] with *Bear Creek Planning Com.* v. *Title Ins. & Trust Co.* (1985) 164 Cal.App.3d 1227 [211 Cal.Rptr. 172].) ■ We need not take a side in this dispute because, even if a cause of action for implied contractual indemnity is recognized, one is not stated in the complaint before us.

Implied contractual indemnity is predicated on the indemnitor's breach of contract. What is implied is an agreement to indemnify foreseeable damages resulting to the plaintiff from the defendant's negligent performance of the contract. (*Bear Creek, supra,* 164 Cal.App.3d at p. 1237.) The bank employees' claim for implied contractual indemnification is based on an "investment letter" signed by Seamen's and NMEC and quoted *haec verba* in their cross-complaints. This investment letter is in the nature of a disclosure statement, not a contract. In it, the investor acknowledges it has received or been given the opportunity to receive information about NMEC and the certificates including the pooling and servicing agreement and data on the mortgage loans; that it has had the opportunity to verify the accuracy of the information furnished by NMEC; and that it has had the opportunity to ask questions and receive answers from NMEC about the terms and conditions of the certificates. The investor also "represents and warrants to NMEC" it has such knowledge and experience in financial and business matters as to make it capable of evaluating the merits and risks of the investment and is able to bear the economic risk of such investment.

---

[2]The bank's complaint alleges the aggregate amount it paid to settle all investors' claims was approximately $133 million. In return, the investors assigned to the bank all interest they had in assets securing the NMEC loans. Accordingly, the bank estimates a net loss of approximately $95 million.

Three points stand out in this investment letter. First, it does not meet the definition of a contract: "an agreement to do or not to do a certain thing." (Civ. Code, § 1549.) Nowhere in this document does the investor promise to do or not do a certain thing. Second, the pooling and servicing agreement between NMEC and Bank of America *was already in existence* when the investor signed the "investment letter" thus contradicting the allegation in the cross-complaints the bank and its employees "reasonably relied upon the acknowledgments, representations and warranties" of the investors "in accepting and handling NMEC trust and/or escrow business." Third, the pooling and servicing agreement referred to in the investment letter provides, in relevant part, "Duties of the Trustee [Bank of America] .... [U]pon receipt of the various certificates, reports or other instruments required to be furnished to it, the Trustee is required to examine them to determine whether they conform to the requirements of the Agreement." Therefore, the risk the investor acknowledged in the investment letter was the risk remaining after the bank had screened the loans securing the certificates. The alleged failure of the bank employees to properly perform this duty is the basis of the instant litigation. We have also reviewed the escrow instructions and the "commitment letter" signed by the investors to see if the complaint could be amended to state a cause of action based on these contracts. Neither contract obligates the investors to do anything which could be implied to be for the benefit of the bank's employees. The investor's only promise in the escrow agreement is to deposit $10 million in escrow for the purchase of NMEC certificates. The "commitment letter" is an offer by NMEC to enter into an executory contract for the sale of certificates. Again, the investor makes no promise to do any act.

### III. THE CROSS-COMPLAINTS FAIL TO STATE CAUSES OF ACTION FOR DECLARATORY RELIEF AGAINST SEAMEN'S

█ The settlement agreement between Seamen's and the bank purports to discharge all claims of Seamen's against the bank and its employees. Nevertheless, the bank's complaint alleges causes of action against the employees as the assignee of Seamen's claims. In their cross-complaints, the bank employees contend Seamen's had no claims to assign in light of the settlement agreement between Seamen's and the bank. They allege they are "informed and believe[ ]" that the bank and Seamen's deny their contention.

A party may demur when the ground for the objection appears from any matter subject to judicial notice. (Code Civ. Proc., § 430.30, subd. (a).) It appears from the bank's complaint the bank, not Seamen's, is asserting Seamen's claims against the bank's employees. Thus, while there appears to be an actual controversy between the bank and its employees over the release provision, there is no controversy between Seamen's and the employees. We

see no basis for dragging Seamen's into this controversy. Code of Civil Procedure section 1060 requires an "actual controversy" to sustain an action for declaratory relief. The bank employees' allegations on information and belief do not satisfy this requirement. One may not allege on information and belief facts presumably within his knowledge. (*Hall* v. *James* (1926) 79 Cal.App. 433, 436 [249 P. 876].) If there is an actual controversy, presumably, the bank employees would know about it.

## DISPOSITION

The petition is granted. Let a peremptory writ of mandate issue directing the Los Angeles County Superior Court to vacate its order overruling the demurrers to the cross-complaints of Eileen Smith, Beverly Hegg and John Smythe against the Seamen's Bank for Savings (No. C 536776) and to enter a new order sustaining the demurrers to the Smith cross-complaint, causes of action 1 through 11 and 18 without leave to amend, cause of action 17 (declaratory relief) with leave to amend; the Hegg cross-complaint, causes of action 1 through 11 and 19 without leave to amend, cause of action 18 (declaratory relief) with leave to amend; the Smythe cross-complaint, causes of action 1 through 12 without leave to amend, cause of action 17 (declaratory relief) with leave to amend.

The alternative writ is discharged and petitioners are awarded costs under Code of Civil Procedure section 1027.

Lillie, P. J., and Thompson, J., concurred.